ALLEE ET AL. *v.* MEDRANO ET AL.

No. 72–1125. Argued November 13, 1973—Decided May 20, 1974

Douglas, J., delivered the opinion of the Court, in which Brennan, Stewart, Marshall, and Blackmun, JJ., joined. Burger, C. J., filed an opinion concurring in the result in part and dissenting in part, in which White and Rehnquist, JJ., joined, *post*, p. 821. Powell, J., took no part in the decision of the case.

*Larry F. York,* First Assistant Attorney General of Texas, argued the cause for appellants. With him on

the brief were *John L. Hill,* Attorney General, and *Joe B. Dibrell, Lang A. Baker,* and *Gilbert J. Pena,* Assistant Attorneys General.

*Chris Dixie* argued the cause and filed a brief for appellees.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a civil rights action,[1] 42 U. S. C. §§ 1983, 1985, attacking the constitutionality of certain Texas statutes, brought by appellees. It alleges that the defendants, members of the Texas Rangers and the Starr County, Texas, Sheriff's Department, and a Justice of the Peace in Starr County, conspired to deprive appellees of their rights under the First and Fourteenth Amendments, by unlawfully arresting, detaining, and confining them without due process and without legal justification, and by unlawfully threatening, harassing, coercing, and physically assaulting them to prevent their exercise of the rights of free speech and assembly. A three-judge court was convened which declared five Texas statutes unconstitutional and enjoined their enforcement. 347 F. Supp. 605, 634. In addition, the court permanently enjoined the defendants from a variety of unlawful practices which formed the core of the alleged conspiracy. Five defendants, all members of the Texas Rangers, have perfected this appeal. 28 U. S. C. § 1253. The appellees

---

*John B. Abercrombie* and *William D. Deakins, Jr.,* filed a brief for Brown & Root, Inc., et al. as *amici curiae* urging reversal.

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

[1] Jurisdiction in the District Court was based upon 28 U. S. C. § 1343, and a three-judge court was properly convened under 28 U. S. C. § 2281.

consist of the United Farm Workers Organizing Committee, certain named plaintiffs,[2] and the class they represented in the District Court on whose behalf the judgment was also rendered.[3]

From June 1966 until June 1967, the appellees were engaged in an effort to organize into the union the predominantly Mexican-American farmworkers of the lower Rio Grande Valley. This effort led to considerable local controversy which brought appellees into conflict with the state and local authorities, and the District Court found that as a result of the unlawful practices enjoined below the organizing efforts were crushed. This lawsuit followed.

The factual findings of the District Court are not challenged here. In early June 1966, at the beginning of the organizing effort, Eugene Nelson, one of the strikers' principal leaders, stationed himself at the International Bridge in Roma, Texas, attempting to persuade laborers from Mexico to support the strike. He was taken into custody by the Starr County Sheriff, detained for four hours, questioned about the strike, and was told he was under investigation by the Federal Bureau of

---

[2] Named in the caption were Francisco Medrano, Kathy Baker, David Lopez, Gilbert Padilla, Magdaleno Dimas, and Benjamin Rodriguez. Other individual plaintiffs were named in the body of the complaint.

[3] The judgment was also rendered for all members of the plaintiff United Farmworkers Organizing Committee, AFL-CIO, and "all other persons who because of their sympathy for or voluntary support of the aims of said Plaintiff union have engaged in, are engaging in, or may hereafter engage in peaceful picketing, peaceful assembly, or other organizational activities of or in support of said Plaintiff union or who may engage in concert of action with one or more of Plaintiffs for the solicitation of agricultural workers or others to join or make common cause with them in matters pertaining to the work and labor of agricultural workers."

Investigation. No charges were ever filed against him. 347 F. Supp., at 612.

In October 1966, about 25 union members and sympathizers picketed alongside the Rancho Grande Farms exhorting the laborers to join the strike; they were ordered to disperse by the sheriffs although their picketing was peaceful. When Raymond Chandler, one of the union leaders, engaged an officer in conversation contesting the validity of the order, he was arrested under Art. 474 of the Texas Penal Code for breach of the peace. Although the maximum punishment for this offense is a $200 fine, bond was set for Chandler at $500. When two of Chandler's friends came to the courthouse to make bond, they were verbally abused, told they had no business there, and that if they did not leave they would be placed in jail themselves. 347 F. Supp., at 612–613. They left.[4]

Later that month, when the president of the local union and others were in the courthouse under arrest, they shouted "viva la huelga" in support of the strike. A deputy sheriff struck the union official and held a gun at his forehead, ordering him not to repeat those words in the courthouse because it was a "respectful place." *Id.*, at 613. As the strike continued through the year and the Texas Rangers were called into the local area, there were more serious incidents of violence. In May 1967 some union pickets gathered in Mission, Texas, to protest the carrying of produce from the valley on the Missouri-Pacific Railroad. They were initially charged with trespass on private property; this was changed to unlawful assembly, and finally was superseded by complaints of secondary picketing. The Reverend Edgar

---

[4] This was not the only abuse of the bonding process. Later when Eugene Nelson was arrested for threatening the life of a Texas Ranger, see *infra*, at 807, the deputy sheriff rejected for no valid reason a bond he knew was good.

Krueger and Magdaleno Dimas were taken into custody by the Rangers. As a train passed, the Rangers held these two prisoners' bodies so that their faces were only inches from the train. *Id.*, at 615.

A few weeks later the Rangers sought to arrest Dimas for allegedly brandishing a gun in a threatening manner, and found him by "tailing" Chandler and Moreno, also union members. Chandler was arrested with no explanation as was Moreno, who was also assaulted by Captain Allee at the time. These two men were later charged with assisting Dimas to evade arrest, although by, Allee's own testimony they were never told Dimas was sought by the Rangers. Indeed, because the officers had no arrest warrant or formal complaint against Dimas, they could not then arrest him, so they put in a call to a justice of the peace who arrived on the scene and filled out a warrant on forms he carried with him. The Rangers then broke into a house and arrested Dimas and Rodriguez, another union member, in a violent and brutal fashion. Dimas was hospitalized four days with a brain concussion, and X-rays revealed that he had been struck so hard on the back that his spine was curved out of shape. Rodriguez had cuts and bruises on his ear, elbow, upper arm, back, and jaw; one of his fingers was broken and the nail torn off. *Id.*, at 616–617.

Earlier, in May, Nelson had gone down to the Sheriff's office, according to appellees, to complain that the Rangers were acting as a private police force for one of the farms in the area. The three-judge District Court found that Nelson was then arrested and charged with threatening the life of certain Texas Rangers, despite the fact that Captain Allee conceded there was no serious threat. Allee had directed that the charges be filed to protect the Rangers from censure if something happened to Nelson. *Id.*, at 615.

During this entire period the Starr County Sheriff's office regularly distributed an aggressive anti-union newspaper. A deputy driving an official car would pick up the papers each week and bring them back to the Sheriff's office; they would then be distributed by various deputies. *Id.*, at 617. The District Court included copies of the paper in an appendix to its opinion; a typical headline was "Only Mexican Subversive Group Could Sympathize with Valley Farm Workers." The views of the Texas Rangers were similarly explicit. On a number of occasions they offered farm jobs to the union leaders, at the union demand wage, in return for an end to the strike. *Id.*, at 613, 614. The Rangers told one union member that they had been called into the area to break the strike and would not leave until they had done so. *Id.*, at 613.

Among other findings of the three-judge District Court were that the defendants selectively enforced the unlawful assembly law, Art. 439 of the Texas Penal Code, treating as criminal an inoffensive union gathering, 347 F. Supp., at 613; solicited criminal complaints against appellees from persons with no knowledge of the alleged offense, *id.*, at 615; and filed baseless charges against one appellee for impersonating an officer.[5]

The three-judge District Court found that the law enforcement officials "took sides in what was essentially a labor-management controversy." *Id.*, at 618. Although there was virtually no evidence of assault upon

---

[5] Deputy Paul Pena filed these charges against Reynaldo De La Cruz although Pena had never seen the offense, which was wearing a badge around the union hall. The badge in question was of the shield type, while those worn by the officers were of the star type, and Pena conceded that he knew that De La Cruz and Dimas had worn similar badges when directing traffic at union functions. 347 F. Supp., at 616.

anyone by union people during the strike, the officials "concluded that the maintenance of law and order was inextricably bound to preventing the success of the strike." *Ibid.* Thus, these were not a series of isolated incidents but a prevailing pattern throughout the controversy.

## I

It is argued that a state injunction [6] against the appellees, issued on July 11, 1967, ended the strike and thus rendered the controversy moot. That is not the case.

After summarizing the defendants' unlawful practices, the District Court concluded that "[t]he union's efforts collapsed under this pressure in June of 1967 and this suit was filed in an effort to seek relief." *Ibid.* Thus it was the defendants' conduct, which is the subject of this suit, that ended the strike, not the state court injunction, which came afterward. With the protection of the federal court decree, appellees could again begin their efforts.

Moreover, the state court injunction is quite limited. It proscribes picketing by the appellees and those acting in concert with them only on or near property owned by La Casita Farms, Inc., the plaintiff in the state case. But the appellants agreed at oral argument that La Casita is *only one of the major employers in the area,* and some of the incidents involved occurred at other locations. Moreover the state court injunction was only temporary, and on appeal the Texas Court of Civil Appeals, after finding that most of the trial court findings were unsupported, affirmed only because of the limited nature of review, under Texas law, of a temporary injunction. The appellate court concluded that "nothing in this

---

[6] *La Casita Farms, Inc.* v. *United Farm Workers Organizing Comm.,* Dist. Ct. of Starr County, Texas, No. 3809, July 11, 1967. Appellants' exhibit D–1 in the District Court.

opinion is to be taken as a ruling that the evidence before us would support the issuance of a permanent injunction . . . ." *United Farm Workers Organizing Comm. v. La Casita Farms, Inc.*, 439 S. W. 2d 398, 403. We were advised at oral argument that no permanent injunction against picketing has ever been issued, and we cannot assume that one will be.

Nor can it be argued that the case has become moot because appellees have abandoned their efforts as a result of the very harassment they sought to restrain by this suit. There can be no requirement that appellees continue to subject themselves to physical violence and unlawful restrictions upon their liberties throughout the pendency of the action in order to preserve it as a live controversy. In the face of appellants' conduct, appellees sought to vindicate their rights in the federal court. In June 1967 they rechanneled their efforts from direct attempts at unionizing the workers to seeking the protection of a federal decree, and hence they brought this suit. In their amended complaint, filed in October 1967, they charged that the defendants' conduct, aimed at all those who make common cause with appellees, "chill[ed] the willingness of people to exercise their First Amendment rights," resulting, as the three-judge District Court found, in the "collapse" of the union drive. Appellees continued to prosecute the suit and won a judgment in December 1972. We may not assume that because during this period they directed their efforts to the judicial battle, they have abandoned their principal cause. Rather, the very purpose of the suit was to seek protection of the federal court so that the efforts at unionization could be renewed. It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the

defendants "would be free to return to '[their] old ways.'" *Gray* v. *Sanders*, 372. U. S. 368, 376; *Walling* v. *Helmerich & Payne, Inc.*, 323 U. S. 37, 43; *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632; *NLRB* v. *Raytheon Co.*, 398 U. S. 25, 27; *SEC* v. *Medical Committee for Human Rights*, 404 U. S. 403, 406. The appellee union remains very much a live organization and its goal continues to be the unionization of farmworkers. The essential controversy is therefore not moot, but very much alive.

## II

We first consider the provisions of the federal court decree enjoining police intimidation of the appellees.[7]

---

[7] "It is further ordered, adjudged and decreed by the Court that Defendants, their successors, agents and employees, and persons acting in concert with them, are permanently enjoined and restrained from any of the following acts or conduct directed toward or applied to Plaintiffs and the persons they represent, to-wit:.

"A. Using in any manner Defendants' authority as peace officers for the purpose of preventing or discouraging peaceful organizational activities without adequate cause.

"B. Interfering by stopping, dispersing, arresting, or imprisoning any person, or by any other means, with picketing, assembling, solicitation, or organizational effort without adequate cause.

"C. Arresting any person without warrant or without probable cause which probable cause is accompanied by intention to present appropriate written complaint to a court of competent jurisdiction.

"D. Stopping, dispersing, arresting or imprisoning any person without adequate cause because of the arrest of some other person.

"E. As used in this Paragraph 16, Subparagraphs A, B and D above, the term 'adequate cause' shall mean (1) actual obstruction of a public or private passway, road, street, or entrance which actually causes unreasonable interference with ingress, egress, or flow of traffic; or (2) force or violence, or the threat of force or violence, actually committed by any person by his own conduct or by actually aiding, abetting, or participating in such conduct by another person; or (3) probable cause which may cause a Defendant to believe in good faith that one or more particular persons did violate a criminal

This part of the decree complements the other relief, in that it places boundaries on all police conduct, not just that which is based upon state statutes struck down by the federal court. The complaint charged that the enjoined conduct was but one part of a single plan by the defendants, and the District Court found a pervasive pattern of intimidation in which the law enforcement authorities sought to suppress appellees' constitutional rights. In this blunderbuss effort the police not only relied on statutes the District Court found constitutionally deficient, but concurrently exercised their authority under valid laws in an unconstitutional manner. While it is argued that a three-judge District Court could not properly be convened if police harassment under concededly constitutional statutes were the only question presented to it, it could properly consider the question and grant relief in the exercise of jurisdiction ancillary to that conferred by the constitutional attack on the state statutes which plainly required a three-judge court.[8]

---

law of the State of Texas other than those specific laws herein declared unconstitutional, or a municipal ordinance."

[8] It is argued that *Public Service Comm'n* v. *Brashear Lines,* 312 U. S. 621, holds that there is no ancillary jurisdiction in three-judge courts. In *Brashear* the plaintiffs refused to pay fees assessed under the statute challenged in their suit; when their attack on the statute failed the defendants sought damages, and the Court held that the damages action should have been heard by a single district judge. This was not a proper exercise of ancillary jurisdiction because the defendants' claim was completely unrelated to the basis on which the three-judge court was convened, and there was no purpose to be served by having it determined by the same tribunal. But we have held that "[o]nce [a three-judge court is] convened the case can be disposed of below or here on any ground, whether or not it would have justified the calling of a three-judge court." *United States* v. *Georgia Public Service Comm'n,* 371 U. S. 285, 287–288. Indeed, the three-judge court is required to hear the nonconstitutional attack upon the statute; *Florida Lime Growers* v. *Jacobsen,* 362

That part of the decree in question here prohibits appellants from using their authority as peace officers to arrest, stop, disperse, or imprison appellees, or otherwise interfere with their organizational efforts, without

U. S. 73, 85; *Rosado* v. *Wyman*, 397 U. S. 397, 402. The instant case is nearly identical to *Milky Way* v. *Leary*, 397 U. S. 98, in which we considered and summarily affirmed the judgment of a three-judge court regarding the assertedly illegal application of a New York statute which was concededly constitutional; this decision was rendered in the exercise of ancillary jurisdiction acquired as a result of a facial attack on a different but related state statute. 305 F. Supp. 288, 296 (SDNY). The part of the decree enjoining police misconduct is intimately bound up with and ancillary to the remainder of the court's judgment, and even *Brashear* held that the court has jurisdiction to hear every question pertaining to the prayer for the injunction "in order that a single lawsuit may afford final and authoritative decision of the controversy between the parties." 312 U. S., at 625 n. 5.

This view was followed in *Perez* v. *Ledesma*, 401 U. S. 82, in which a three-judge District Court had sustained a state obscenity statute against the federal constitutional attack that provided the basis for convening it. But the District Court went on to determine that the arrests of the plaintiffs and the seizures incident thereto were unconstitutional because no prior adversary hearing had been held, 304 F. Supp. 662, 667 (ED La.), and therefore issued an order suppressing the evidence in the state court case. We reviewed that order on the merits, assuming it was properly before us as an appeal "from an order granting or denying . . . an interlocutory or permanent injunction in any civil" action required to be heard by a three-judge court. See 401 U. S., at 89 (STEWART, J., concurring). The basis for ancillary jurisdiction here is at least as compelling.

It is true that we also held in *Perez* that an order striking down a local parish ordinance was not properly before us. But that was an attack on a wholly different enactment not involving detailed factual inquiries common with and ancillary to the constitutional challenge on the state law supporting the three-judge court's jurisdiction. And central to our determination was the finding that the order regarding the parish ordinance "was not issued by a three-judge court, but rather by Judge Boyle, acting as a single district judge." *Id.*, at 87. That is obviously not the case here.

"adequate cause." "Adequate cause" is defined as (1) actual obstruction of public or private passways causing unreasonable interference, (2) force or violence, or threat thereof, actually committed by any person, or the aiding and abetting of such conduct, or, (3) probable cause to believe in good faith that a criminal law of the State of Texas has been violated, other than the ones struck down in the remainder of the decree. On its face the injunction does no more than require the police to abide by constitutional requirements; and there is no contention that this decree would interfere with law enforcement by restraining the police from engaging in conduct that would be otherwise lawful.

Thus the only question before us is whether this was an appropriate exercise of the federal court's equitable powers. We first note that this portion of the decree creates no interference with prosecutions pending in the state courts, so that the special considerations relevant to cases like *Younger* v. *Harris,* 401 U. S. 37, do not apply here. Nor was there any requirement that appellees first exhaust state remedies before bringing their federal claims under the Civil Rights Act of 1871 to federal court. *McNeese* v. *Board of Education,* 373 U. S. 668; *Monroe* v. *Pape,* 365 U. S. 167. Nonetheless there remains the necessity of showing irreparable injury, "the traditional prerequisite to obtaining an injunction" in any case. *Younger, supra,* at 46.

Such a showing was clearly made here as the unchallenged findings of the District Court show. The appellees sought to do no more than organize a lawful union to better the situation of one of the most economically oppressed classes of workers in the country. Because of the intimidation by state authorities, their lawful effort was crushed. The workers, and their leaders and organizers were placed in fear of exercising their

constitutionally protected rights of free expression, assembly, and association. Potential supporters of their cause were placed in fear of lending their support. If they were to be able to regain those rights and continue furthering their cause by constitutional means, they required protection from appellants' concerted conduct. No remedy at law would be adequate to provide such protection. *Dombrowski* v. *Pfister*, 380 U. S. 479, 485–489.

Isolated incidents of police misconduct under valid statutes would not, of course, be cause for the exercise of a federal court's equitable powers. But "[w]e have not hesitated on direct review to strike down applications of constitutional statutes which we have found to be unconstitutionally applied." *Cameron* v. *Johnson*, 390 U. S. 611, 620, citing *Cox* v. *Louisiana*, 379 U. S. 559; *Wright* v. *Georgia*, 373 U. S. 284; *Edwards* v. *South Carolina*, 372 U. S. 229. Where, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate. In *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, we affirmed the granting of such relief under strikingly similar facts. There also law enforcement officials set out to crush a nascent labor union. The police interfered with the lawful distribution of pamphlets, prevented the holding of public meetings, and ran some labor organizers out of town. The District Court declared some of the municipal ordinances unconstitutional. In addition, it enjoined the police from "exercising personal restraint over [the plaintiffs] without warrant or confining them without lawful arrest and production of them for prompt judicial hearing . . . or interfering with their free access to the streets, parks, or public places of the city," or from "interfering with the right of the [plaintiffs], their agents and those acting with them, to communicate their views as individuals

to others on the streets in an orderly and peaceable manner." *Id.*, at 517. The lower federal courts have also granted such relief in similar cases.[9]

For reasons to be stated, that portion of this relief based on holdings that certain state statutes are unconstitutional should be modified. In all other respects this portion of the District Court decree was quite proper.[10]

### III

Finally, we consider the portion of the District Court's judgment declaring five Texas statutes unconstitutional, with the accompanying injunctive relief. We have been pressed with arguments by the appellants that these parts of the decree are inconsistent with the teachings of *Younger* v. *Harris,* 401 U. S. 37, and *Samuels* v. *Mackell,* 401 U. S. 66. For reasons explained below, it is unnecessary to reach these contentions at present.

*Younger* and its companion cases are grounded upon the special considerations which apply when a federal

---

[9] In *NAACP* v. *Thompson,* 357 F. 2d 831 (CA5), the Court of Appeals reversed the denial of relief by the District Court, concluding that defendants believed that plaintiffs' demonstrations "must be suppressed and that, in order to do so, they intend to take advantage of any law or ordinance, however inapplicable or however slight the transgression, and to continue to harass and intimidate [the] plaintiffs." *Id.,* at 838. The findings here show at least that much. In *Lankford* v. *Gelston,* 364 F. 2d 197 (CA4) (en banc), the court ordered the police enjoined from making searches without probable cause after concluding that the "raids were not isolated instances undertaken by individual police officers." *Id.,* at 202. See also *Wolin* v. *Port of New York Authority,* 392 F. 2d 83 (CA2).

[10] There was no challenge here to the District Court's conclusion that this was a proper class action, see n. 14, *infra.* Moreover as to this portion of the decree, directed at police misconduct generally rather than to any particular state statute, named plaintiffs intimidated by misconduct may represent all others in the class of those similarly abused, without regard to the asserted state statutory basis for the police actions.

court is asked to intervene in pending state criminal prosecutions. *Steffel* v. *Thompson*, 415 U. S. 452. Although both parties here have assumed the relevance of *Younger*, we have been unable to find any precise indication in the District Court opinion or in the record that there were pending prosecutions at the time of the District Court decision. Indeed, the chronology of events gives rise to the contrary inference. Although the District Court issued its opinion in December 1972, the union effort which was the source of this contest had been interrupted more than five years earlier. It seems likely that any state prosecutions initiated during the effort would have been concluded by that time unless they had been restrained by a temporary order of the federal court. But there is no indication that such an order was ever issued. Moreover, the injunctive relief granted does not appear to be directed at restraining any state court proceedings.[11]

---

[11] The decree is not directed at any state prosecutors or state judges with the exception of one justice of the peace whose involvement apparently consisted of issuing warrants without proper basis. Moreover it does not in terms restrain any prosecutions, but only the "arresting, imprisoning, filing criminal charges, threatening to arrest, or ordering or advising or suggesting that [appellees] disperse under authority of any portion of" the statutes struck down. A reading of the complaint suggests that no injunctive relief against pending prosecutions was ever requested. As to whether there in fact were pending prosecutions, our only guidance from the District Court is a passing reference that "plaintiffs [are] now facing charges in the Texas courts . . . ," 347 F. Supp., at 620, but it is impossible to determine against whom any charges might be pending. Indeed, in light of the District Court's failure to treat the statutes separately in their findings of harassment, we cannot be certain that their reference to pending charges here is a finding that there are charges pending under each of the statutes. And if there are state charges pending, we could do no more than speculate as to why trial never commenced during the five-year pendency of the federal suit. This may be the result of an informal agreement with the federal court, or it may indicate

If in fact there were no pending prosecutions, the relief could have impact only on future events in which the challenged statutes might be invoked by the appellants. Since this remains a live, continuing controversy, such relief would ordinarily be appropriate if justified by the merits of the case. *Gray* v. *Sanders,* 372 U. S. 368, 376. But here we have a special situation, for three of the statutes in question have since been repealed by the Texas Legislature. Article 474 of the Penal Code, the breach-of-the-peace provision, has been replaced by §§ 42.01, 42.03, and 42.05 in the new codification; Art. 482, the abusive-language statute, has been replaced by § 42.01; and Art. 439, the unlawful-assembly provision, has been replaced by § 42.02. These new enactments, which replaced the earlier statutes as of January 1, 1974, are more narrowly drawn than their predecessors. Whatever the merits of the District Court's conclusions on the earlier statutes, any challenge to the new provisions presents a different case.

Thus, although there was a live controversy as to these statutes at the time of the District Court decree, if there are no pending prosecutions under the old statutes, the portions of the District Court's judgment relating to them has become moot.[12] But because we cannot determine with certainty whether there are pending prosecutions, or even whether the District Court intended to enjoin them if there were, the proper disposition is to remand the case to the District Court for further find-

---

that the State has abandoned any intention to bring these cases to trial. Indeed it may be that state law would bar prosecutions now after such a delay. See Tex. Const., Art. 1, § 10, and Tex. Code Crim. Proc., Art. 32.01. It is therefore appropriate to remand to the District Court for further findings on this question.

[12] In the federal system an appellate court determines mootness as of the time it considers the case, not as of the time it was filed. *Roe* v. *Wade,* 410 U. S. 113, 125.

ings. Cf. *Diffenderfer* v. *Central Baptist Church,* 404 U. S. 412. If there are no pending prosecutions *under these superseded statutes,* the District Court should vacate both the declaratory and injunctive relief as to them. If there are pending prosecutions remaining against any of the appellees,[13] then the District Court should make findings as to whether these particular prosecutions were brought in bad faith, with no genuine expectation of conviction.[14] If it so finds, the court will

---

[13] If there are pending prosecutions against members of the class not named in the action, the District Court must find that the class was properly represented. Appellants stipulated in District Court that "plaintiffs are properly representative of the class they purport to represent." Document 33, ¶ 2, Record on Appeal. In this regard we note that the union was itself a named plaintiff, and the judgment was issued on behalf of all of its members.

In this case the union has standing as a named plaintiff to raise any of the claims that a member of the union would have standing to raise. Unions may sue under 42 U. S. C. § 1983 as persons deprived of their rights secured by the Constitution and laws, *American Fed. of State, Co., & Mun. Emp.* v. *Woodward,* 406 F. 2d 137 (CA8), and it has been implicitly recognized that protected First Amendment rights flow to unions as well as to their members and organizers. *Carpenters Union* v. *Ritter's Cafe,* 315 U. S. 722; cf. *NAACP* v. *Button,* 371 U. S. 415, 428.. If, as alleged by the union in its complaint, its members were subject to unlawful arrests and intimidation for engaging in union organizational activity protected by the First Amendment, the union's capacity to communicate is unlawfully impeded, since the union can act only through its members. The union then has standing to complain of the arrests and intimidation and bring this action.

[14] See *Dombrowski* v. *Pfister,* 380 U. S. 479, 490: "[A]ppellants have attacked the good faith of the appellees in enforcing the statutes, claiming that they have invoked, and threaten to continue to invoke, criminal process without any hope of ultimate success, but only to discourage appellants' civil rights activities." See also *Cameron* v. *Johnson,* 390 U. S. 611, 619–620, and *Perez* v. *Ledesma,* 401 U. S. 82, 118 n. 11 (separate opinion of BRENNAN, J.).

enter an appropriate decree which this Court may ultimately review, both as to the propriety of federal court intervention in the circumstances of the case, and as to the merits of any holding striking down the state statutes.

As to the two remaining statutes, Tex. Civ. Stat., Arts. 5154d and 5154f, it is not necessary for other reasons for us at this time to reach any *Younger* questions or the merits of the decision below as to the statutes' constitutionality. As to these also we must remand for a determination as to whether there are pending prosecutions, although if there are none the appellees might still be threatened with prosecutions in the future since these statutes are still in force. But if there are only threatened prosecutions, and the appellees sought only declaratory relief as to the statutes, then the case would not be governed by *Younger* at all, but by *Steffel* v. *Thompson,* 415 U. S. 452, decided this Term.[15] The District Court, of course, did not have the benefit of our opinion in *Steffel* at the time of its decision. We therefore think it appropriate to vacate the judgment of the District Court as to these statutes and remand for further findings and reconsideration in light of *Steffel* v. *Thompson.* If there are pending prosecutions then the District Court should determine whether they were brought in bad faith, for the purpose of harassing appellees and deterring the exercise of First Amendment rights, so that allowing the prosecutions to proceed will result in irreparable injury to the appellees. If there are no pending prosecutions and only declaratory relief is sought, then *Steffel* clearly controls and no *Younger* showing need be made.

---

[15] We do not reach the question reserved in *Steffel* as to whether a *Younger* showing is necessary to obtain injunctive relief against threatened prosecutions. See generally Note, Federal Relief Against Threatened State Prosecutions: The Implications of *Younger, Lake Carriers* and *Roe,* 48 N. Y. U. L. Rev. 965 (1973).

In summary, we affirm the decree granting injunctive relief against police misconduct, with appropriate modifications to delete reference to the five statutes held unconstitutional by the District Court. We vacate the District Court's judgment as to those five statutes, and remand for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the decision of this case.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE WHITE and MR. JUSTICE REHNQUIST join, concurring in the result in part and dissenting in part.

On June 1, 1966, appellee United Farm Workers Organizing Committee, AFL–CIO (the union), called a strike of farmworkers in Starr County, Texas. After the strike collapsed a year later the union and six individuals active in the strike[1] brought this action in United States District Court for the Southern District of Texas against five Texas Rangers, the Sheriff, two Deputy Sheriffs, and a Special Deputy of Starr County, Texas, and a Starr County Justice of the Peace, alleging that the defendants unlawfully suppressed the plaintiffs and the class of union members and sympathizers they purported to represent in the exercise of their First and Fourteenth Amendment rights of free speech and association during the strike.[2] The suppression was alleged to have been caused in part through the enforcement of six Texas statutes which plaintiffs claimed to have been unconstitutional. The District Court, convened as a

---

[1] Francisco Medrano, Kathy Baker, David Lopez, Gilbert Padilla, Magdaleno Dimas, and Benjamin Rodriguez.

[2] Jurisdiction is alleged under 28 U. S. C. §§ 1343, 2201, 2202, 2281, and 2284, and 42 U. S. C. §§ 1983 and 1985.

three-judge court, agreed with plaintiffs as to five of
the statutes[3] and declared them to be unconstitutional
and enjoined their enforcement. The District Court also
entered an injunction prohibiting acts of misconduct
by defendants and those associated with them. 347
F. Supp. 605 (1972). The five Texas Rangers appealed the District Court's judgment to this Court.
We noted probable jurisdiction. 411 U. S. 963 (1973).

The Court today vacates the judgment of the District
Court as it deals with the relief granted against the
enforcement of the statutes, and remands for further
findings and for reconsideration, in the case of the relief
granted with respect to two of the statutes, in light of
*Steffel* v. *Thompson,* 415 U. S. 452 (1974). In so doing
the Court avoids significant legal issues which are fairly
presented in this appeal and which must be resolved now.
They deserve full treatment for the benefit not only of
the District Court on remand but of other courts that
must wrestle with the myriad problems presented in
applying the doctrine of *Younger* v. *Harris,* 401 U. S. 37
(1971). I undertake to deal with some of those issues.
The Court neither accepts nor rejects my reasoning and
ultimate resolution of the issues; the majority simply
chooses not to reach the issues. I, therefore, concur only
in the result of the remand. The Court also affirms the
decree granting injunctive relief against police misconduct as slightly modified to reflect the remand. For the
reasons stated below I dissent from that result.

## I

The facts as found by the District Court are not in
dispute. A review of those facts is necessary for an

---

[3] Tex. Penal Code, Arts. 439 (unlawful assembly), 474 (breach
of the peace), and 482 (abusive language) (1952), and Tex. Rev.
Civ. Stat., Arts. 5154d (mass picketing) and 5154f (secondary picketing and boycotting) (1971).

understanding of some of the difficult legal issues in this appeal.

(a) On June 8, 1966, one Eugene Nelson, a strike leader, was taken into custody and detained for four hours without any charges being filed against him. While in custody he was questioned about his strike activities and informed that the Federal Bureau of Investigation would be investigating him regarding alleged threats of violence against the local courthouse and buses used to transport Mexican farmworkers to their jobs. When taken into custody, Nelson was at an international bridge attempting to persuade workers to join the strike.

(b) Another union leader, Raymond Chandler, was arrested on October 12, 1966, at a picketing site when he refused to obey an order to disperse and became involved in an altercation using loud and vociferous language to a deputy sheriff of Starr County. Chandler was apparently arrested for violating Tex. Penal Code, Art. 474, the disturbing-the-peace statute. Bond was set at $500 although the maximum punishment for violation of Art. 474 is a $200 fine. Two of Chandler's friends who came to the courthouse to make bond were verbally abused and threatened with arrest by deputy sheriffs.

(c) On October 24, 1966, a deputy sheriff used violence and the threat of deadly force to subdue the president of the local union who, while under arrest and in custody in a courthouse, had just shouted out "viva la huelga" with some fellow arrestees.

(d) On November 9, 1966, the Texas Rangers, who had by this time been called in to help keep peace and order during the pendency of the strike, served a warrant of arrest on a Reynaldo De La Cruz, charging a violation of Tex. Rev. Civ. Stat., Art. 5154f, on November 3, 1966, when members of the union picketed produce packing sheds located on Missouri Pacific Rail-

road tracks. While De La Cruz was under arrest two Texas Rangers made anti-union statements to the arrestee.

(e) Charges were filed by a deputy sheriff against Reynaldo De La Cruz on December 28, 1966, for impersonating an officer by wearing a badge in and around the union hall. The deputy had not witnessed the offense; the badge was of the shield type, while sheriff's deputies and Texas Rangers wore badges in the shape of stars. The deputy who filed the charges admitted that he was aware of his own knowledge that similar badges had been worn by De La Cruz and another when directing traffic at Union functions. Also on that date Librado De La Cruz attempted to grab a nonstriking farm employee by the coat, and was arrested immediately and charged with assault.

(f) On the evening of January 26, 1967, about 20 union supporters were gathered at the Starr County Courthouse to conduct a peaceful prayer vigil in protest of arrests of union members earlier that day. Two members of the group mounted the courthouse steps, and when the group was ordered by a sheriff's deputy to leave the courthouse grounds, the two on the steps refused and were arrested for unlawful assembly, apparently in violation of Tex. Penal Code, Art. 439. One of the two arrested was Gilbert Padilla, the first of the named plaintiffs to enter the chronology. The other was a minister.

(g) On February 1, 1967, nine persons were arrested and charged with disturbing the peace, apparently in violation of Tex. Penal Code, Art. 474, for exhorting field laborers to quit work.

(h) Three months later, on May 11, 1967, other events occurred: appellant Captain A. Y. Allee of the Texas Rangers informed picketing strikers that he could get them

a job within 10 minutes at the union-demanded wage. Also on that day a Texas Ranger shoved two persons connected with the strike, including one of the named plaintiffs, David Lopez. Both of those shoved attempted to file charges of assault but the county attorney determined that there was insufficient evidence to go forward with the complaint.

(i) On the following day, May 12, 1967, strikers were allowed to peacefully picket in accordance with Tex. Rev. Civ. Stat., Art. 5154d, the mass picketing statute, and were allowed to depart after being detained for a short period of time at the picketing site.

(j) On May 12, 1967, Eugene Nelson was arrested for threatening the life of certain Texas Rangers although appellant Allee did not take the threat seriously, and a bond was not accepted until tax records could be checked following the weekend, although there was no valid reason for waiting since the deputy sheriff to whom the bond was tendered knew full well that the surety was a landowner and a person of substance in Starr County.

(k) On May 26, 1967, 14 persons were arrested for trespassing. The charge was later changed to unlawful assembly, and this charge was superseded by a secondary picketing and boycott charge. Ten persons were arrested when they allegedly attempted to block a train carrying produce. The second group of four persons was arrested later in the evening. The four were apparently arrested for unsuccessfully encouraging bystanders to picket and were ultimately charged with secondary picketing and boycotting upon the complaint of a railroad special agent who had left the scene prior to the events which caused this second series of arrests. Included in the group was Magdaleno Dimas, another named plaintiff. The findings recite that a Mrs. Krueger, another one of this second group, was arrested "either for

taking a picture of her husband's arrest or attempting to strike Captain Allee with her camera in her husband's defense." 347 F. Supp., at 615. The four arrestees in the second group were roughly handled. The findings concerning this entire incident are not set out with clarity.

(l) On May 31, 1967, the Texas Rangers arrested apparently 13 pickets for allegedly violating the mass picketing statute, Tex. Rev. Civ. Stat., Art. 5154d.

(m) On June 1, 1967, the Texas Rangers sought and arrested Magdaleno Dimas at the home of Kathy Baker, another named plaintiff, for allegedly having previously brandished a gun in a threatening manner in the presence of a special deputy of Starr County. Two other persons were arrested for assisting Dimas to evade arrest. Benjamin Rodriguez, a third named plaintiff, was arrested at the same time the police apprehended Dimas, although the District Court does not explain why Rodriguez was arrested. The arrests of Dimas and Rodriguez were found by the District Court to have been accomplished in a brutal and violent fashion.

(n) While the strike was in progress the Starr County Sheriff's office assisted in the regular distribution of a strongly anti-union newspaper. Each week deputies would pick up and then locally distribute copies of the paper.

## II

In this part, I consider the problems of mootness and standing. In Part III, I discuss *Younger* v. *Harris*, 401 U. S. 37 (1971), and its applicability to the facts of the instant case. The injunction against police misconduct is dealt with in Part IV.

The principal relief granted by the District Court was the declaration that five Texas statutes are unconstitutional and the injunction against their continued enforcement. The District Court determined on the

facts as it found them that appellees had overcome the burden imposed by *Younger* v. *Harris, supra,* and the court was, therefore, empowered to reach the merits of the constitutional challenges to the statutes. Although the District Court recited evidence as to arrests and charges having been filed, the court did not make explicit findings of specific prosecutions pending at the time of the commencement of the action or at the time of its decision. Since the facts of possible prosecutions pending now and at the commencement of the action are crucial to matters of mootness, standing, and the applicability of *Younger* v. *Harris,* we should remand to the District Court for further findings in this area.

Three of the statutes held to be unconstitutional by the District Court have been repealed by the Texas Legislature in a new codification of the Penal Code. Articles 439 (unlawful assembly), 474 (breach of the peace), and 482 (abusive language) can no longer be employed to arrest appellees or members of their class. On remand the District Court should first determine whether appellees had standing to commence this action respecting these three statutes. "It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct. *Massachusetts* v. *Mellon,* 262 U. S. 447, 488 (1923)." *O'Shea* v. *Littleton,* 414 U. S. 488, 494 (1974). Even if by the operation, *i. e.,* arrest and prosecution, or threatened operation of the statutes, one or more appellees had standing to commence this action, the District Court will be obliged to resolve the "question as to the *continuing* existence of a live and acute controversy." *Steffel* v. *Thompson,* 415 U. S., at 459. (Emphasis in original.) See also *Indiana Employment Division* v. *Burney,* 409 U. S. 540 (1973). Since the statutes have been re-

828

pealed threats of future prosecution can no longer suffice to establish a live controversy. The injury that appellees faced and face must then result from pending prosecutions under each of the challenged statutes now repealed.

The two other statutes held unconstitutional by the District Court, Tex. Rev. Civ. Stat., Arts. 5154d and 5154f, have not been repealed, and I cannot say, on this record, that the possibility of future prosecutions is or is not real. The District Court should examine the standing of appellees to challenge the constitutionality of these statutes under the same guidelines as applicable to the three repealed statutes, except that prosecution remains hypothetically possible under these two statutes. See *Steffel* v. *Thompson, supra,* at 459.

We have recently held in *O'Shea* v. *Littleton, supra,* at 493, that standing must be personal to and satisfied by "those who seek to invoke the power of federal courts." See also *Bailey* v. *Patterson,* 369 U. S. 31, 32–33 (1962); *Long* v. *District of Columbia,* 152 U. S. App. D. C. 187, 190, 469 F. 2d 927, 930 (1972). If an individual named appellee was and is subject to prosecution under one of the challenged statutes, that appellee would have standing to challenge the constitutionality of that statute. If an individual named appellee was and is threatened with prosecution under one of the extant statutes, that appellee would have standing to challenge its constitutionality. Prosecutions instituted against persons who are not named plaintiffs cannot form the basis for standing of those who bring an action. In particular, a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he

does not share. Standing cannot be acquired through the back door of a class action. *O'Shea* v. *Littleton, supra; Bailey* v. *Patterson, supra,* at 32–33.[4]

In addition to any individual named appellees the union itself may have standing to challenge the constitutionality of the statutes. The Court has long recognized that the First Amendment's guarantees of free speech and assembly have an important role to play in labor disputes. *Thornhill* v. *Alabama,* 310 U. S. 88, 102 (1940); *Thomas* v. *Collins,* 323 U. S. 516, 532 (1945). I agree with the Court that unions, as entities, in addition to union members and organizers, are entitled to the benefit of those guarantees and that a union may sue under 42 U. S. C. § 1983 to enforce its First Amendment rights.

Here the appellee union alleged in the complaint that it was deprived of its constitutional rights of free speech and assembly by the actions of defendants in enforcing the challenged Texas statutes. If, as claimed by the union, union members were subject to unlawful arrest and threats of arrest in their First Amendment protected organizational activity on behalf of the union, the union would have derivatively suffered or have been in the position to suffer derivatively real injury and would have standing to complain of that injury and bring this action.[5] If a person who was a member of the union both at the time of that person's arrest and at the present time

---

[4] The Court states that "the District Court must find that the class was properly represented." *Ante,* at 819 n. 13. I take this to mean that the named plaintiff must be an appropriate representative for the class; the named plaintiff must have suffered the same injury as the class purportedly represented, and that injury must be sufficient to accord the named plaintiff standing to sue in his own right. *Bailey* v. *Patterson,* 369 U. S. 31, 32–33 (1962); *Long* v. *District of Columbia,* 152 U. S. App. D. C. 187, 190, 469 F. 2d 927, 930 (1972).

[5] See *Sierra Club* v. *Morton,* 405 U. S. 727, 739 (1972); *NAACP* v. *Button,* 371 U. S. 415, 428 (1963).

would have. standing individually to challenge the constitutionality of one of the five statutes, then the Union itself would have such standing, since the inability of the union member to communicate freely restricts the ability of the union to communicate. As the Court states, *ante*, at 819 n. 13, a union "can act only through its members." [6]

### III

### (A)

The District Court on remand will be faced with the issue of the applicability of *Younger* v. *Harris*, 401 U. S. 37 (1971), to appellees. Since standing and the continued existence of a live controversy as to the action in relation to the three repealed statutes depend on the pendency of prosecutions under each of the statutes, it will be necessary for appellees to meet *Younger* standards to reach the constitutional merits of any of these statutes.

To the extent that they can prove standing, the individual appellees will be seeking federal court interference in their own state court prosecutions. The union, to the extent that it has standing, will be seeking interference with state court prosecutions of its members. There is an identity of interest between the union and its prosecuted members; the union may seek relief only because of the prosecutions of its members,[7] and

---

[6] The union may, of course, be directly subject to criminal prosecution. A union prosecuted or threatened with prosecution *qua* union would be in the same position as an individual litigant with regard to standing and *Younger* v. *Harris*, 401 U. S. 37 (1971). The special rules outlined in this opinion are designed for the more common situation where the union is not injured by being proceeded against directly in the operation of the criminal laws, but, rather, is injured derivatively from prosecutions and threats of prosecutions of its members.

[7] See n. 6, *supra*.

only by insuring that such prosecutions cease may the union vindicate the constitutional interests which it claims are violated. The union stands in the place of its prosecuted members even as it asserts its own constitutional rights. The same comity considerations apply whether the action is brought in the name of the individually arrested union member or in the name of the union, and there is no inequity in requiring the union to abide by the same legal standards as its members in suing in federal court. If the union were unable to meet the requirements of *Younger*, its members subject to prosecution would have a full opportunity to vindicate the First Amendment rights of both the union and its members in the state court proceedings. Any other result would allow the easy circumvention of *Younger* by individuals who could assert their claims of First Amendment violations through an unincorporated association of those same individuals if the association is immune from *Younger* burdens.

This result is not contrary to that reached in *Steffel* v. *Thompson*, 415 U. S. 452 (1974), where the arrest of one demonstrator was not imputed for *Younger* purposes to petitioner who brought suit for declaratory relief against the application of the state statute under which the other demonstrator was arrested and petitioner was only threatened with arrest. There was no indication in that case that petitioner and the arrestee were associated otherwise than in the distribution of antiwar handbills. Furthermore, in *Steffel*, the petitioner departed to avoid arrest while his companion in handbilling stayed. The joint activity of petitioner and his companion in *Steffel* ceased prior to the arrest of the companion. Finally, there is no indication that the arrestee would seek to or be able to vindicate petitioner's rights in the criminal proceeding, and on such a factual showing it would be unfair to re-

quire petitioner to await the outcome of state court proceedings he was not a party to and had no apparent connection with. No such unfairness inheres in this situation where the union might be required to await state criminal trials of its members to vindicate rights it holds in common with those members and was deprived of derivatively only through prosecutions directed at those members.[8]

- The process of determining when *Younger* applies becomes more complex when dealing with the two extant statutes. If there are state court prosecutions against the individual appellees or the union under these statutes then *Younger* requirements must be met. If there are prosecutions against members of the union under these statutes (and the union asserts standing derivatively) then the *Younger* hurdle must be met for the reasons stated. If standing of individual appellees or the union to challenge one of the statutes is based *solely* on threatened prosecutions, and the relief pursued below with respect to that statute is declaratory only, then *Younger* does not apply. *Steffel* v. *Thompson, supra.* If appellees seek injunctive relief with respect to the operation or enforcement of a statute for the violation of which prosecutions are threatened, the question of whether *Younger* applies has not been answered by this Court. *Steffel* v. *Thompson, supra,* at 463. Since the issue may well not arise on remand it would be premature now to attempt to resolve it. The development of what relief was and still is requested by appellees is a matter

---

[8] There is no need now to attempt to further define those situations in which it would be proper to impute the state criminal prosecution of one who is not a federal plaintiff to one who is. The association of the state criminal defendant and the federal plaintiff necessary for imputation will depend upon facts of joint activity and common interest.

best left to the District Court on remand.[9] Finally, if the union sues on the basis of injury to its members, then since, as to a statute challenged, one member must, if suing on his own behalf, meet the requirements of *Younger,* the union must do so, even though other of its members would not be so burdened if they had brought suit individually. The requirements of *Younger* are not to be evaded by artificial niceties.

## (B)

The next step in the analysis is to define the burdens imposed by *Younger* v. *Harris.* There we held that before a federal court can interfere with state criminal proceedings great and immediate irreparable injury must be shown "above and beyond that associated with the defense of a single prosecution brought in good faith." 401 U. S., at 48. The injury must include, except in extremely rare cases, "the usual prerequisites of bad faith and harassment." *Id.,* at 53. In *Younger* the Court made clear that the mere fact that the statute under which the federal court plaintiff is being proceeded against is unconstitutional on its face "does not in itself justify an injunction against good-faith attempts to

---

[9] The relief open to the District Court on remand is limited by the repeal of three of the statutes. Since the statutes no longer exist, they can have no conceivable further "chilling effect" on others in the exercise of their constitutionally protected rights. The justification has disappeared, then, for permitting a litigant to challenge a statute, not because of the unconstitutional application of the statute as to his conduct, but rather because the statute *might* as to *other* persons be applied in an unconstitutional manner. By repealing the statutes, the State has "remove[d] the seeming threat or deterrence to constitutionally protected expression," and the District Court should not apply the "strong medicine" of the overbreadth doctrine, which "has been employed by the Court sparingly and only as a last resort" to hold statutes unconstitutional on their face. *Broadrick* v. *Oklahoma,* 413 U. S. 601, 613 (1973).

enforce it." *Id.,* at 54. The Court described as "important and necessary" the State's task of enforcing statutes which may have an incidental inhibiting effect on First Amendment rights, "against socially harmful conduct that the State believes in good faith to be punishable under its laws and the Constitution." *Id.,* at 52.

*Younger* principles not only mandate federal court abstention in the case of good-faith enforcement of facially unconstitutional statutes, but also require that claims of unconstitutionality, other than facial invalidity, be presented, in the first instance, to the state court in which the criminal prosecution involving the claimed constitutional deprivation is pending. In *Perez* v. *Ledesma,* 401 U. S. 82 (1971), the United States District Court upheld the challenged Louisiana anti-obscenity statute as valid on its face [10] but ruled that the arrests of the state court defendants-federal court plaintiffs and the seizure of the allegedly obscene materials were invalid because of a lack of a prior adversary hearing on the character of the materials. We held such interference to be improper:

> "The propriety of arrests and the admissibility of evidence in state criminal prosecutions are ordinarily matters to be resolved by state tribunals, see *Stefanelli* v. *Minard,* 342 U. S. 117 (1951), subject, of course, to review by certiorari or appeal in this Court or, in a proper case, on federal habeas corpus. Here Ledesma was free to present his federal constitutional claims concerning arrest and seizure of materials or other matters to the Louisiana courts in the manner permitted in that State. Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary

---

[10] But see n. 18, *infra.*

circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate. . . . There is nothing in the record before us to suggest that Louisiana officials undertook these prosecutions other than in a good-faith attempt to enforce the State's criminal laws." *Id.*, at 84–85.

A state court is presumed to be capable of fulfilling its "solemn responsibility . . . 'to guard, enforce, and protect every right granted or secured by the Constitution of the United States . . . .' *Robb* v. *Connolly*, 111 U. S. 624, 637 (1884)." *Steffel* v. *Thompson*, 415 U. S., at 460–461. Yet a state court cannot effectively fulfill its responsibility when the prosecutorial authorities take deliberate action, in bad faith, unfairly to deprive a person of a reasonable and adequate opportunity to make application in the state courts for vindication of his constitutional rights. When such an individual, deprived of meaningful access to the state courts, faces irreparable injury to constitutional rights of great and immediate magnitude, either in the immediate suit or in the substantial likelihood of "repeated prosecutions to which he will be subjected," *Younger* v. *Harris*, 401 U. S., at 49, and the injury demands prompt relief, federal courts are not prevented by considerations of comity from granting the extraordinary remedy of interference in pending state criminal prosecutions.

A breakdown of the state judicial system which would allow federal intervention was the allegation of appellants in *Dombrowski* v. *Pfister*, 380 U. S. 479 (1965). In that case appellants had offered to prove, *inter alia*, that the state prosecutor was holding public hearings at which were being used photostatic copies of illegally seized evidence, which evidence had already been ordered suppressed by a state court. It was alleged further that

the prosecutor was threatening to use other copies of the illegally seized documents before the grand jury to obtain indictments. If proved, the allegations in *Dombrowski* made out a clear case of a breakdown in the checks and balances in the state criminal justice system. The courts had lost control of a prosecutor embarked on an alleged campaign of harassment of appellants, designed to discourage the exercise of their constitutional rights. Under such circumstances federal intervention would be authorized.

To meet the *Younger* test the federal plaintiff must show manifest bad faith and injury that is great, immediate, and irreparable, constituting harassment of the plaintiff in the exercise of his constitutional rights, and resulting in a deprivation of meaningful access to the state courts. The federal plaintiff must prove both bad faith and requisite injury. In judging whether a prosecution has been commenced in bad faith, the federal court is entitled to take into consideration the full range of circumstances surrounding the prosecutions which the federal plaintiff would have the district court interfere with. A federal court must be cautious, however, and recognize that our criminal justice system works only by according broad discretion to those charged to enforce laws. Cf. *Santobello* v. *New York*, 404 U. S. 257 (1971). In this regard, prosecutors will often, in good faith, choose not to prosecute or to discontinue prosecutions for entirely legitimate reasons. An individual, once arrested, does not have a "right" to proceed to trial in order to make constitutional claims respecting his arrest. Conversely, prosecutors may proceed to trial with less than an "open and shut" case against the defendants. In *Cameron* v. *Johnson*, 390 U. S. 611, 621 (1968), the Court noted:

"[T]he question for the District Court was not the

guilt or innocence of the persons charged; the question was whether the satute was enforced against them with no expectation of convictions but only to discourage exercise of protected rights. The mere possibility of erroneous application of the statute does not amount 'to the irreparable injury necessary to justify a disruption of orderly state proceedings.' *Dombrowski* v. *Pfister, supra,* at 485. The issue of guilt or innocence is for the state court at the criminal trial; the State was not required to prove appellants guilty in the federal proceeding to escape the finding that the State had no expectation of securing valid convictions." (Footnote omitted.)

One step removed from the decision of the prosecutor to prosecute is the decision of the policeman to arrest. The bad-faith nature of a prosecution may sometimes be inferred from the common activity of the prosecutor and the police to employ arrests and prosecutions unlawfully to discourage the exercise of civil rights. The conclusion that the prosecutor and police are acting as one to deprive persons of their rights should not be inferred too readily on the basis of police action alone. Just as is the case with prosecutors, the police possess broad discretion in enforcing the criminal laws. Police cannot reasonably be expected to act upon a realizacion that a law that they are asked to enforce may be unconstitutional. Even when police cross the line of legality as they enforce statutes they may not be acting willfully; the precise contours of probable cause, like the Fourth Amendment's stricture against unreasonable search and seizure, are far from clear. When a policeman willfully engages in patently illegal conduct in the course of an arrest there still should be clear and convincing proof, before bad faith can be found, that this was part of a common plan or scheme, in concert with the prosecutorial au-

thorities, to deprive plaintiffs of their constitutional rights. Willful, random acts of brutality by police, although abhorrent in themselves, and subject to civil remedies, will not form a basis for a finding of bad faith. The police may, of course, embark on a campaign of harassment of an individual or a group of persons without the knowledge or assistance of the prosecutorial authorities. The remedy in such a case would not lie in enjoining state prosecutions, which would provide no real relief, but in reaching down through the State's criminal justice system to deal directly with the abuses at the primary law enforcement level. Cf. *Lankford* v. *Gelston,* 364 F. 2d 197 (CA4 1966). See, *infra.*

Unless the injury confronting a state criminal defendant is great, immediate, and irreparable, and constitutes harassment, the prosecution cannot be interfered with under *Younger.* The severity of the standard reflects the extreme reluctance of federal courts to interfere with pending state criminal prosecutions.

If the federal court plaintiff seeks injunctive or declaratory relief based on claimed facial invalidity of a statute, the injury may derive not only from the prosecutions the plaintiff is currently facing where a violation of that statute is alleged, but also from the probability of future prosecutions under that statute. Evidence of multiple arrests and prosecutions of persons other than the federal plaintiff under that statute may well bear on the likelihood of future arrests and prosecutions of the federal plaintiff. A state criminal defendant seeking relief against more than one statute, must prove the requisite degree of injury separately for each statute he challenges. Any other rule would encourage insubstantial and multiple attacks on the constitutionality of state statutes by persons hoping to meet the strict standards of injury by accumulating effects under many

state provisions in order to reach the constitutional merits of only one or a few. Furthermore, the considerations of comity which underlie *Younger* would be ill served if a federal court were to employ a showing of bad faith and harassment respecting prosecutions brought under one facially challenged statute as a pretext for searching a State's statutory code for unconstitutional provisions to strike down. Cf. *Boyle* v. *Landry*, 401 U. S. 77, 81 (1971).

The same rule must, perforce, apply when the relief sought is limited in scope, by way of constitutional challenges to statutes as applied, to interference only with specific prosecutions. Since no relief is requested which could affect the future operation or enforcement of a statute (as would be the case when a statute is challenged on its face), the injury must derive solely from the imminence of the single prosecution. The possibility of future arrests, under color of any state statutes, is irrelevant to proof of injury from the challenged prosecution. It will be the rare case, indeed, where a single prosecution provides the quantum of harm that will justify interference. On the other hand, in the case of an attack on the facial constitutionality of a statute, the likely prospect of multiple prosecutions, brought also in bad faith and without hope of conviction, for the violation of the same statute which formed the basis for the pending prosecutions of the federal court plaintiff, might well constitute a sufficient showing of harm to justify a federal court's decision to reach the constitutionality of the statute.

A special problem in proof of *Younger* injury arises with the Union: shall the Union be permitted to aggregate the injuries which all its members will reasonably suffer under the operation of statutes, or must the injury test be satisfied independently by one person who was and is a member of the Union? For the reason ex-

pressed above as to why prosecutions of union members should be attributed to the union for *Younger* purposes—that any other rule would allow of easy and unfair circumvention of *Younger*—the necessary injury must be confronted by any single member.[11] If no single member faces *Younger* injury, then the union, which operates through its members, cannot realistically be said to face such injury.

With these principles in mind it is appropriate to turn to the facts in the instant case. The District Court assumed that *Younger* was applicable, and held, on the basis of the facts that it found, that the requirements of *Younger* had been met. The District Court then proceeded to the constitutional merits of each of the challenged statutes. The District Court's *Younger* holding was in error.

There is no reason for deferring review of the District Court's legal conclusion that *Younger* was satisfied, although the Court would, apparently, allow appellees to have a second chance at proving this element of their case. Although the trial of this action took place in 1968, the District Court's decision had not been handed down by the time *Younger* was issued in 1971. In September 1971, the parties were requested by the District Court to file supplemental briefs on the impact of *Younger* on this cause. In their briefs, appellants argued that the federal court was required under *Younger* to abstain, while appellees argued that *Younger* did not apply to the instant case, and, alternatively, that if *Younger* did apply the test of *Younger*

---

[11] Proof that other union members have been subject to bad-faith arrests and prosecutions under a statute may be relevant to a claim that a union member faces injury from a substantial likelihood of being arrested and prosecuted in bad faith in the future under color of the same statute. See *supra*, at 838.

had been met. Appellees did not request hearings to adduce further proof relating to *Younger* bad faith and harassment. There is, therefore, no basis for reopening the matter on remand, and taking up valuable judicial time relitigating an issue as to which both sides have had their day in court. Failure to decide now whether appellees have met the *Younger* requirements with respect to challenges to the five statutes whose validity remains in issue would cause needless delay in a lawsuit already far removed in time from the events which precipitated it. With respect to the three repealed statutes, if the action is not moot appellees will be met with a *Younger* burden they have been unable to satisfy. With respect to the two extant statutes, the action will be moot, appellees will have failed to satisfy *Younger,* or appellees will not have had to satisfy *Younger,* only having been threatened with prosecutions. In any case, resolution of the *Younger* issues in this case at this time by the Court will expedite proceedings on remand and remove from this suit controverted matters ripe for judicial determination.

Appellees can, of course, seek to further amend their amended complaint to make further allegations of fact regarding the events which took place during the one-year strike, and the District Court will then have to judge whether after nearly seven years "justice so requires" the amendment. Fed. Rule Civ. Proc. 15 (a).

The findings of fact by the District Court do not justify the legal conclusion that any of the appellees were in danger of suffering harm that was great, immediate, and irreparable, and constituted harassment, with respect to any one of the statutes. Such a showing must be made by each appellee separately regarding each statute. I now turn to an analysis of the facts, first on

the injury-harassment issue, and then to determine whether there was bad faith.

The only persons found to have been arrested for violating Tex. Penal Code, Art. 439 (unlawful assembly), were the two leaders of the January 26, 1967, prayer vigil. For five months thereafter no arrests took place under this statute. At the end of May 1967, 14 other persons [12] were arrested for trespassing, and later charged with unlawful assembly. These latter charges were pending only for three days before being dropped and replaced with charges of secondary picketing and boycotting. The evidence relating to Art. 439 is clearly insufficient to sustain any inference that any appellee, including the union, faced the prospect of repeated arrests in the future under this statute. There is no showing that having to defend the state criminal actions instituted as a result of the arrests that were made under the statute would be in any manner unusually onerous and seriously damaging to any of the arrestees. They were traditional arrests with traditional burdens of defending against charges.

On two occasions arrests were made for violating Tex. Penal Code, Art. 474 (breach of the peace): of Raymond Chandler on October 12, 1966, and of nine persons (apparently not including Mr. Chandler [13]) on February 1, 1967. Thereafter, to June 1967, no arrests were made and no charges were filed for violations of this provision. No inference can be made that any person faces the likelihood of repeated and unwarranted arrests under this statute. There is nothing in the findings to suggest and no reason to believe that the few prosecutions resulting from enforcement of this statute will

---

[12] See ¶ 7.20 of the amended complaint, and 347 F. Supp. 605, 615 (SD Tex. 1972).

[13] See ¶ 7.13 of the amended complaint, and 347 F. Supp., at 614.

result in any extraordinary hardship differing from that ordinarily associated with the usual defense of a criminal action.

It appears that five members of the Union were arrested for violating Tex. Penal Code, Art. 482 (abusive language) on January 26, 1967, about midway through the strike.[14] The absence of *Younger* injury is even clearer in the challenge to this statute.

Another example of a single instance of enforcement of a statute is the arrest of 13 persons, on one occasion, May 31, 1967, for violating Tex. Rev. Civ. Stat., Art. 5154d (mass picketing). The facts are totally insufficient for a finding of the serious injury required under *Younger*.

Fourteen persons who were arrested for trespassing on May 26, 1967, were later charged with unlawful assembly, but those charges were pending only for three days, at the end of which time the 14 were charged with violating Tex. Rev. Civ. Stat., Art. 5154f, the secondary picketing and boycott provision. The only other time persons were charged with violating Art. 5154f was on November 9, 1966, when a complaint was filed against 10 persons for illegal picketing on November 3, 1966. The District Court does not challenge the grounds for issuing the complaint, but questions only the manner of the custody following the arrest of one of the 10, but that objectionable action had nothing whatever to do with the *offense* for which the individual was arrested. As with the four other statutes found unconstitutional, the test of serious injury under *Younger* is not met by such an inadequate showing of future harm.

Appellees also failed to prove that any prosecutions which might have resulted from these arrests were brought in bad faith. Very nearly all the evidence of

---

[14] See ¶ 7.11 of the amended complaint, and 347 F. Supp., at 613.

bad faith found by the District Court relates to activities of the Texas Rangers and the Starr County Sheriff's Office, not of the prosecutors. Evidence bearing on the allegations of prosecutorial bad faith is restricted to three items: first, the District Court is mildly critical of an investigation, apparently inadequate, made by the County Attorney of Starr County into the shoving incident of May 11, 1967, and the subsequent decision not to go forward with the complaint which had been filed by the two men who had been shoved; second, a prosecutor conceivably could have had something to do with the excessively high bond set after Raymond Chandler's arrest on October 12, 1966, but there is no finding on this point; third, those arrested on February 1, 1967, for disturbing the peace were informed by the Justice of the Peace, on instructions from the County Attorney, that if they ever appeared in that court again under the same charge they would have to post bond.[15] The record does not contain a finding that prosecutions were brought and then promptly dropped; in one instance persons arrested for violating an unchallenged statute on May 26, 1967, were later charged first with violating Tex. Penal Code, Art. 439, a challenged statute, and subsequently with violating Tex. Rev. Civ. Stat., Art. 5154f, also a challenged statute.

Nor can the isolated instances of police misconduct by Texas Rangers and Starr County Sheriff's deputies found by the District Court turn a series of prosecutions, apparently instituted in good faith (even assuming that all persons who were arrested are or were facing prosecutions as a result of their arrests), into a campaign of terror against the union which could only be remedied

---

[15] I can find nothing improper with this warning. A second offense under the same statute is usually looked on more seriously than a first.

by recourse to the federal courts. Excluding the distribution of the antiunion newspaper, which activity could hardly be said to have a direct and immediate disruptive effect on daily picketing and other organizational efforts of the Union, the District Court found only 12 days during this long controversy in which law enforcement or judicial officers of Texas acted in an improper fashion in dealing with strikers or strike sympathizers; this is an average of one per month. One of the "abuses" found by the District Court was the shoving of two persons. On another occasion, May 26, 1967, a camera was confiscated, two men were held near a passing train, and four persons were "roughly handled," 347 F. Supp., at 615, after their arrest by the Texas Rangers. All that happened on May 11, 1967, was that Captain Allee [16] of the Texas Rangers told picketing strikers that he could get them all jobs at the Union-demanded wage. "[P]icketing occurred every day," of the strike with the exception of Sundays, id., at 612, yet no allegedly harassing action was taken against the strikers after June 8, 1966, to October 12, 1966, a period of over four months, or after February 1, 1967, to May 11, 1967, a period of over three months. Finally, it is not surprising that the Texas Rangers and Sheriff's deputies would have found occasions to enforce laws governing picketing, assembly, and the peace of the community, against persons who sought to attain their goals by picketing, assembling, and otherwise making themselves and their cause heard in Starr County. Judging by the infrequency of occasions of enforcement of such laws the strike did not

---

[16] Captain Allee is, apparently, no longer in active service having retired from the Texas Rangers. According to appellees he is no longer a member of the Texas Department of Public Safety. Defendants' Supplemental District Court Brief 6 (filed Oct. 26, 1971). If appellees no longer have an active controversy with Captain Allee the suit should be dismissed as moot as to him.

become an object of obsessive interest with the law enforcement personnel in Starr County.

In sum, the findings cannot be read as showing either bad faith or the requisite injury with respect to the operation and enforcement of any of the five challenged statutes. Appellees have totally failed to satisfy the demands of *Younger* v. *Harris*, 401 U. S. 37 (1971).

## IV

The District Court not only declared five Texas statutes unconstitutional and enjoined their enforcement, but also issued an injunction against what I shall term "police misconduct." The injunction against police misconduct is issued on behalf of the named plaintiffs and the class they represent,

> "to-wit, the members of Plaintiff United Farm Workers Organizing Committee, AFL–CIO, and all other persons who because of their sympathy for or voluntary support of the aims of said Plaintiff union have engaged in, are engaging in, or may hereafter engage in peaceful picketing, peaceful assembly, or other organizational activities of or in support of said Plaintiff union or who may engage in concert of action with one or more of Plaintiffs for the solicitation of agricultural workers or others to join or make common cause with them in matters pertaining to the work and labor of agricultural workers."

The injunction itself appears as paragraph 16 of the District Court's Final Judgment. This remarkable injunction reads in full as follows:

> "16. It is further ordered, adjudged and decreed by the Court that Defendants, their successors, agents and employees, and persons acting in concert with them, are permanently enjoined and restrained

from any of the following acts or conduct directed toward or applied to Plaintiffs and the persons they represent, to-wit:

"A. Using in any manner Defendants' authority as peace officers for the purpose of preventing or discouraging peaceful organizational activities without adequate cause.

"B. Interfering by stopping, dispersing, arresting, or imprisoning any person, or by any other means, with picketing, assembling, solicitation, or organizational effort without adequate cause.

"C. Arresting any person without warrant or without probable cause which probable cause is accompanied by intention to present appropriate written complaint to a court of competent jurisdiction.

"D. Stopping, dispersing, arresting or imprisoning any person without adequate cause because of the arrest of some other person.

"E. As used in this Paragraph 16, Subparagraphs A, B and D above, the term 'adequate cause' shall mean (1) actual obstruction of a public or private passway, road, street, or entrance which actually causes unreasonable interference with ingress, egress, or flow of traffic; or (2) force or violence, or the threat of force or violence, actually committed by any person by his own conduct or by actually aiding, abetting, or participating in such conduct by another person; or (3) probable cause which may cause a Defendant to believe in good faith that one or more particular persons did violate a criminal law of the State of Texas other than those specific laws herein declared unconstitutional, or a municipal ordinance."

This Court lacks jurisdiction to review this injunction on direct appeal from the District Court; but assuming

this Court has jurisdiction over this portion of the final judgment, it should be remanded to the District Court along with the remainder of its judgment. For my part, if I were to rule on the merits of the injunction against police misconduct I would reverse.

### (A)

The Court does not have jurisdiction on appeal over paragraph 16 of the Final Judgment. The proper course is to vacate and remand this portion of the District Court judgment for entry of a fresh judgment from which timely appeal can be taken to the Court of Appeals for the Fifth Circuit. See *Edelman* v. *Townsend,* 412 U. S. 914, 915 (1973).

This Court may hear on appeal

> "an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges." 28 U. S. C. § 1253.

Congress has provided, by 28 U. S. C. § 2281 that no interlocutory or permanent injunction against the enforcement, operation, or execution of a state statute may be granted on the ground of unconstitutionality unless the application for the injunction is heard and determined by a three-judge district court.

"This Court has more than once stated that its jurisdiction under the Three-Judge Court Act is to be narrowly construed since 'any loose construction of the requirements of [the Act] would defeat the purposes of Congress . . . to keep within narrow confines our appellate docket.' *Phillips* v. *United States* [312 U. S. 246,] 250." *Goldstein* v. *Cox,* 396 U. S. 471, 478 (1970). In consonance with that philosophy in *Public Service Comm'n* v. *Brashear Lines,* 312 U. S. 621 (1941),

the Court, in a unanimous opinion written by Mr. Justice Black, held that following the denial by a three-judge District Court of the application for an injunction against an allegedly unconstitutional state statute, a single District Judge should have heard the motion to assess damages arising out of the temporary restraining order granted by a single District Judge pending the hearing by the three-judge court on the injunction application.

"The limited statutory duties of the specially constituted three judge District Court had been fully performed before the motion for assessment of damages was filed. For § 266 of the Judicial Code provides for a hearing by three judges, instead of one district judge, only in connection with adjudication of a very narrow type of controversy—applications for temporary and permanent injunctions restraining state officials from enforcing state laws or orders made pursuant thereto upon the ground that the state statutes are repugnant to the Federal Constitution. The motion for damages raised questions not within the statutory purpose for which the two additional judges had been called. Those questions were therefore for the consideration of the District Court in the exercise of its ordinary jurisdiction, and the three judge requirement of § 266 had no application." *Id.*, at 625 (footnotes omitted).

The Court was careful to state that a three-judge court "has jurisdiction to determine every question involved in the litigation pertaining to the prayer for an injunction, in order that a single lawsuit may afford final and authoritative decision of the controversy between the parties." *Id.*, at 625 n. 5.

We reaffirmed our *Brashear* holding in *Perez* v. *Ledesma,* 401 U. S. 82 (1971). In *Perez* the appellees were charged in informations filed in state court with vio-

lations of a Louisiana statute and a local parish ordinance. The three-judge Federal District Court "held" the state statute to be facially constitutional,[17] but ruled that arrests and seizures of materials were invalid and entered a suppression order and required the return of the seized materials to the appellees. The District Court also expressed its view that the parish ordinance was invalid. The District Judge who initially referred the action to the three-judge court adopted that court's view and declared the ordinance invalid. We refused to review the decision concerning the local ordinance, stating:

> "Even if an order granting a declaratory judgment against the ordinance had been entered by the three-judge court below (which it had not), that court would have been acting in the capacity of a single-judge court. We held in *Moody* v. *Flowers,* 387 U. S. 97 (1967), that a three-judge court was not properly convened to consider the constitutionality of a statute of only local application, similar to a local ordinance. Under 28 U. S. C. § 1253 we have jurisdiction to consider on direct appeal only those civil actions 'required . . . to be heard and determined' by a three-judge court. Since the constitutionality of this parish ordinance was not 're-quired . . . to be heard and determined' by a three-judge panel, there is no jurisdiction in this Court to review that question.

> "The fact that a three-judge court was properly convened in this case to consider the injunctive relief requested against the enforcement of the state statute, does not give this Court jurisdiction on direct appeal over other controversies where there is no independent jurisdictional base. Even where

---

See n. 18, *infra.*

a three-judge court is properly convened to consider one controversy between two parties, the parties are not necessarily entitled to a three-judge court and a direct appeal on other controversies that may exist between them. See *Public Service Comm'n* v. *Brashear Freight Lines*, 306 U. S. 204 (1939)." 401 U. S., at 86–87.[18] (Footnote omitted.)

*Brashear Lines* and *Perez* are authority for the proposition that a three-judge district court convened under

---

[18] The Court would rely on *Milky Way* v. *Leary*, 397 U. S. 98 (1970), for the contrary proposition: that this Court has jurisdiction to review by way of direct appeal ancillary matters decided by a three-judge district court in the exercise of its primary three-judge court review of the constitutional validity of state statutes. The precedential value of our summary affirmance in this case is somewhat diminished by the fact that the *Brashear* problem was not raised in any of appellees' briefs. In fact, one of the appellees, contrary to *Brashear*, appears to concede that this Court possesses jurisdiction to review ancillary matters decided by a properly convened three-judge court. Motion to Dismiss or Affirm of Appellee Frank S. Hogan 9 (No. 992, O. T. 1969). It should be noted, further, that *Perez* v. *Ledesma*, which included a full analysis of ancillary jurisdiction on direct appeal from a three-judge court, was decided after *Milky Way* was summarily affirmed.

Although the District Court in *Perez* stated that it held the state statute to be facially constitutional, the decision of the District Court there that the arrests and seizures were unconstitutional appears in fact to have derived from a broad condemnation of obscenity statutes, including the state statute dealt with in that case, without provisions incorporated therein protecting against criminal liability for acts occurring prior to an adversary judicial determination of obscenity. 304 F. Supp. 662, 667 (ED La. 1969). In effect, then, the District Court in *Perez* acted broadly to render a nullity the Louisiana statute, see *id.*, at 673 (Rubin, J., dissenting), and we, therefore, properly had jurisdiction over the appeal and we properly ruled on the question of whether the District Court could have interfered with state court criminal proceedings by invalidating arrests and seizures made without any prior adversary hearing.

§ 2281 must restrict itself narrowly to the adjudication of those matters which bear directly on the grant or denial of injunctive relief against state statutes. So long as the constitutional claim is not insubstantial the three-judge court may consider nonconstitutional claims urged alternatively in support of the injunctive relief, and we have jurisdiction to review such nonconstitutional portions of the district court's decision. *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73 (1960).[19] Indeed, a three-judge district court would be required to give priority to consideration of a statutory claim over a constitutional claim. *Rosado* v. *Wyman,* 397 U. S. 397, 402 (1970). However, in ruling on nonconstitutional challenges to the operation of state statutes, the district court remains concerned with the same form of relief—injunctive—directed at the same state statutes, as it would if it were ruling on the constitutional claim, and is not, therefore, involved in solving any "other controversy" between the parties. *Perez, supra.* Similarly, the only noninjunctive relief regularly granted by three-judge district courts is a declaratory judgment of unconstitutionality. Not only is a finding of unconstitutionality a necessary concomitant to the enjoining of the operation and enforcement of a state statute on constitutional grounds, but a declaration of unconstitutionality does not reach in its effect beyond the same state statutes which are subject to the injunction.

---

[19] The Court in *Jacobsen* reasoned that

"[t]o hold to the contrary would be to permit *one* federal district judge to enjoin enforcement of a state statute on the ground of federal unconstitutionality whenever a non-constitutional ground of attack was also alleged, and this might well defeat the purpose of § 2281." 362 U. S., at 80. (Emphasis in original.)

To hold that a three-judge district court is not required to hear matters unrelated to the determination of whether to enjoin the enforcement of state statutes, would pose no similar risk.

A three-judge district court should not venture beyond these two narrow and necessary exceptions to the general rule that a three-judge court is not required to hear any matters beyond the constitutional challenge to the statute which led to its convening. For example, a three-judge court should not retain jurisdiction to assess damages, *Brashear Lines, supra,* or to insure enforcement of a decree which it entered adjudging the statute unconstitutional. Cf. *Hamilton* v. *Nakai,* 453 F. 2d 152, 160–161 (CA9 1971), cert. denied, 406 U. S. 945 (1972).

Any other rule would

> "encumber the district court, at a time when district court calendars are overburdened, by consuming the time of three federal judges in a matter that was not required to be determined by a three-judge court." *Rosado* v. *Wyman, supra,* at 403.

And any other rule would burden this Court through the unnecessary expansion of our jurisdiction on direct appeal. The District Court's broad injunction against police misconduct in this case without even a semblance of reasoned analysis provides a compelling example of the need for a review by an intermediate appellate tribunal to sort out the facts and issues necessary for review here, should that occur. This case presents a glaring example of an undue burden placed on this Court: to wrestle with difficult legal issues on the basis of a record inadequately digested and analyzed by the District Court and untouched by the scrutiny of the Court of Appeals. From its findings of fact the District Court has drawn almost impressionistic conclusions regarding the scope and impact of the perceived abuses of the Texas law enforcement authorities. It is as if the District Court viewed the conduct of the police and prosecutors as directed against one individual, rather than many, over a brief period of time, rather than a year. This

is an instance where the remoteness of intervening appellate review would have provided a salutary perspective on the factually complex and impassioned debate waged in the trial court.

Even if the general rule were other than that no ancillary relief in aid of injunctive relief should issue from a three-judge court, the injunction against police misconduct in this case could not be considered to be ancillary to the primary relief so as to confer jurisdiction upon this Court on direct appeal. Enjoining enforcement of *state statutes* is a far different enterprise from enjoining *specific police misconduct;* a separate review of the first by this Court and the second by a court of appeals would not result in a fragmented appeal. In the application of the *Younger* v. *Harris*, 401 U. S. 37 (1971), test of "bad faith and harassment" a court would look to certain specific types of police and prosecutorial misconduct as a predicate for reaching the merits of the constitutional attack against state statutes for the violation of which persons are being subject to prosecution. A finding of police harassment necessary for the issuance of an injunction against police misconduct is not quasi-jurisdictional as with *Younger,* but is a determination on the merits. Under *Younger* a court is concerned principally with police and prosecutorial misconduct which denies to a person subject to the state laws a fair opportunity to have his challenges to those laws heard by the state courts, whereas, in weighing whether to issue an injunction against police misconduct, a court would likely be concerned solely with police misconduct which itself denies persons their constitutional rights. While there may be some overlap of facts possibly relevant to the quasi-jurisdictional *Younger* v. *Harris* determination and to the merits of whether to grant an injunction against police misconduct, there would be no identity of

proof, the legal standards to apply to the facts would not be the same, and the nature and object of each determination would be different.

Thus, an injunction against *police misconduct* would not be so related to injunctive relief against the operation of *unconstitutional state statutes* as to require a three-judge district court, even if *Brashear* and *Perez* did not apply to foreclose our consideration of paragraph 16 of the District Court's judgment. Upon the issuance of the declaratory and injunctive relief against the five Texas statutes the three-judge District Court should have dissolved itself and referred the case to the single District Judge to whom the case was originally assigned for whatever further proceedings were necessary.

### (B)

Assuming, *arguendo,* that this Court has jurisdiction to review the injunction against police misconduct, the proper course would be to vacate and remand that portion of the District Court's judgment.

The injunction against police misconduct was entered by the District Court without benefit of independent analysis in its findings or opinion. The penultimate paragraph in the opinion of the District Court is the sole discussion provided regarding the injunction that was later entered:

> "In addition, plaintiffs are also entitled to a permanent injunction restraining the defendants not only from any future acts enforcing the statutes here declared void, but also restraining them from any future interference with the civil rights of plaintiffs and the class they represent. Hairston v. Hutzler, 334 F. Supp. 251 (W. D. Pa. 1971)." 347 F. Supp., at 634.

The District Court's catch-all discussion of the facts appears to have been made solely with a view of overcoming the *Younger* barrier to adjudication of appellees' claims and not to establish any legal rationale for the injunction against police misconduct. The injunction's crucial term "adequate cause" is defined, in part, by reference to the declarations of unconstitutionality of the five Texas statutes. Evidently, the District Court's purpose in including this further injunctive relief against police misconduct in its judgment was to protect the integrity and aid in the enforcement of the primary declaratory and injunctive relief ordered by the Court. If the Court now remands to the District Court that part of the judgment which encompasses the primary relief, it would seem logical to also send back for reconsideration the relief which the District Court apparently premised on the existence of the primary relief. Since it is possible that following the remand the District Court will conclude that no relief directed against the operation or enforcement of the challenged statutes should be entered, the District Court should have the opportunity to consider whether the injunction against police misconduct would any longer be appropriate.

### (C)

Finally, I am satisfied the District Court abused its discretion when it granted this injunction against police misconduct.

The injunction as entered would allow review by the federal court, by way of contempt proceedings, of claims which would, at the same time, be *sub judice* in ongoing state criminal proceedings. For example, assume a deputy sheriff made an arrest without a warrant and incident to that arrest seized evidence relevant to proof of a criminal offense. The arrestee can seek to suppress

the evidence in his state criminal trial on the ground that the arrest which preceded the seizure was not based upon probable cause. The injunction against police misconduct would permit a trial of the same claim in federal court. Final Judgment, par. 16 (C). *Perez* v. *Ledesma*, 401 U. S. 82 (1971), and *Samuels* v. *Mackell*, 401 U. S. 66 (1971), would require a *Younger* showing before any contempt citation could issue in such a situation. An injunction which contemplates this type of interference in state criminal proceedings is invalid on its face. "A federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable." *O'Shea* v. *Littleton*, 414 U. S., at 500. Although *O'Shea* dealt with the propriety of an injunction which would purport to punish as contempt actions of judicial officers taken during the course of state criminal proceedings, the potential for disruption of state criminal proceedings, which was a principal concern in our analysis in *O'Shea*, is just as real a possibility in the case of the District Court's injunction against police misconduct. However accomplished

"such a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which this Court has recognized . . . ." *Id.*, at 502.

The injunction, in its paragraph 16 (B), appears to leave no room for temporary restraint for investigation of suspicious activities premised on less than probable cause which this Court has held to be constitutional. *Terry* v. *Ohio*, 392 U. S. 1 (1968).

The problems created by this injunction against police misconduct are manifold. In the enforcement of the in-

junction, the District Court will likely place itself on a collision course with our holdings in *Younger* and *O'Shea*. The fact that the law enforcement officers in Starr County and, indeed, in the whole State of Texas will be compelled to enforce the law only under threat of criminal contempt proceedings in the United States District Court of the Southern District of Texas, illustrates the reckless course of action embarked upon by the District Court in issuing this injunction. Federal district courts were not meant to be super-police chiefs, disciplining individual law enforcement officers for infractions of the rules for arrests and searches and seizures. A district court which improperly intrudes upon local police functions "can undermine the important values of police self-restraint and self-respect." *Long* v. *District of Columbia,* 152 U. S. App. D. C. 187, 194, 469 F. 2d 927, 934 (1972) (Wright, J., concurring).

For all the problems that this injunction is likely to create, I find no reason to believe that it will provide meaningful relief for appellees. Comment, The Federal Injunction as a Remedy for Unconstitutional Police Conduct, 78 Yale L. J. 143 (1968).[20]

---

[20] The author of the Comment wrote:

"For tolerated constitutional violations, a prohibitory injunction which only ordered high police officials to refrain from unconstitutional conduct would be useless—the problem lies not in what such officials are doing but in what they are *not* doing. Purely prohibitory injunctions would have to be directed against the subordinate policemen who were acting illegally. But courts would be unable to enforce such injunctions unless they were willing to take over the task of disciplining individual policemen. Such an approach would be highly inefficient since the court's only means of enforcing its orders directly against policemen—a contempt proceeding—would be far too cumbersome and heavy-handed to deal effectively with large numbers of alleged violations.

"If the injunction is to have any utility as a remedy for tolerated police abuse, it must require affirmative action by the officials

· The District Court, here, has entered an injunction which is ineffective in providing relief to appellees and likely to provoke extreme resentment among those the injunction restrains [21] and genuine concern among all those who still adhere to the proposition that state and federal relations should be governed by notions of comity.

In any event, I believe that the facts which were found by the District Court [22] do not support the granting of a prohibitory or mandatory injunction against police conduct.

> "[R]ecognition of the need for a proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers engaged in the administration of the State's criminal laws in the absence of a showing of irreparable injury which is ' "both great and immediate." ' [*Younger* v. *Harris,* 401 U. S. 37, 46 (1971).]" *O'Shea* v. *Littleton,* 414 U. S., at 499.

Injunctions against police misconduct should be issued, if at all, in only the most extreme cases, see, *e. g., Lankford* v. *Gelston,* 364 F. 2d 197 (CA4 1966), and then only to the extent that the relief granted would not "unnecessarily involve the courts in police matters and dictate action in situations in which discretion and flex-

---

responsible for police conduct." 78 Yale L. J., at 147. (Emphasis in original; footnote omitted.)

[21] The injunction may run against all the judicial officers in Texas. A Justice of the Peace is a named defendant. The injunction enjoins "Defendants, their successors, agents and employees, and persons acting in concert with them." *O'Shea* v. *Littleton,* 414 U. S. 488 (1974), would seem plainly to forbid anticipatory interference by an injunction in the official activities of state judicial officers.

[22] See Parts I and III, *supra.*

ibility are most important. In order for a court to grant an injunction, there should be a showing that there is a substantial risk that future violations will occur." *Long* v. *District of Columbia, supra,* at 192, 469 F. 2d, at 932. The acts of police misconduct were few and scattered. There was no basis for the issuance of an injunction against police misconduct.