DESERT PALACE, INC., dba Caesars
Palace, Plaintiff,

v.

LOCAL JOINT EXECUTIVE BOARD OF
LAS VEGAS, and Culinary Workers
Union, Local 226, Defendants.

No. CIV–LV–79–97 HEC.

United States District Court,
D. Nevada.

March 13, 1980.

William J. Rosenthal, Baltimore, Md., Stephen L. Morris, Las Vegas, Nev., for plaintiff.

Philip Paul Bowe, Nancy Roberts (argued), San Francisco, Cal., Dennis Sabbath, Las Vegas, Nev., for defendants.

## DECISION

CLAIBORNE, District Judge.

This is an action per 29 U.S.C. § 185 and 9 U.S.C. § 10 for vacation of an Arbitrator's

award, purportedly resolving a labor dispute. The action is before the Court on cross-Motions for Summary Judgment. Because of the nature of this action, and the fact that the material facts herein are not in dispute, the within action is ripe for Decision by reason of the within Motions.

## FINDINGS OF FACT

Plaintiff, Desert Palace, Inc., dba Caesars Palace (hereinafter referred to as "Caesars Palace" or "the Hotel") operates a large showroom called the "Circus Maximus" which features live entertainment by renowned entertainers, and operates seven (7) nights a week throughout the year, two shows a night, at 9:00 p. m. and 12:30 a. m.[1] The Hotel employees who serve drinks in the showroom are represented by Defendants herein (hereinafter referred to as "the Union").

Prior to May 18, 1978, members of the public who were not complemented by the Hotel or part of a tour package or convention group would make reservations in advance to see a show with either a Hotel reservations clerk or the maitre d'. The cost of the show to the patron was the same, regardless of seating, and included two or three drinks. At the conclusion of the show, showroom servers would present the patron with a bill which included the charge for the show and whatever drinks the patron may have ordered in excess of the 2–3 drinks which were included in the price of the show. Beyond that the customer was free to leave a gratuity. Additionally, under the system in effect prior to May 18, 1978, no specific seat assignments were made and guests who wanted more desirable seats found it necessary to tip the maitre d' and/or showroom captain in order to obtain them. As a result, prior to May 18, 1978, the showroom servers earned an average of $78 to $125 per week in gratuities.

In an effort to reduce losses in the showroom portion of its operations, the Hotel decided to implement a new "showroom reservations" system, said system becoming operational on May 18, 1978. Under the new system, the Hotel installed a Ticketron outlet, and customers would select one of two designated areas in which to sit in advance of the actual show, paying a higher price if they wished to have a better seat. This system, of course, obviated the necessity of leaving a gratuity with the maitre d' or showroom captain in order to obtain a desired seat. Additionally, after May 18, the price of the admission ticket did not include any food or beverage charges whatsoever; drinks were made available upon request to showroom customers at $1.00 per drink—considerably lower than the $2.00–$3.50 cost of a drink in the Hotel bars and restaurants outside of the showroom—with wine and champagne also being made available.

The Hotel took the position that it was not obligated under the Collective Bargaining Agreement with the Union, effective 3/26/76 through 4/1/80, to pay gratuities to showroom servers within the jurisdiction of the Union from the revenues generated by the Ticketron sales. As a result, the employees' gratuity income dropped from $78–125 per week to $4–5 per night. Accordingly, the Union immediately filed two grievances on May 18, 1978, concerning the changes in operation of the showroom. The Union expressed two contentions: first, that the Hotel had violated § 18 of the Agreement, in that sales under the Ticketron system to the general public constituted a "special event," thereby entitling the showroom servers to 15% of the then-current "minimum" charge under the Ticketron system; and second, in the alternate, that the Hotel had violated § 1.01 of the Agreement, in that the implementation of the Ticketron System had so altered the duties of the showroom servers as to entitle the Union to immediate bargaining concerning increased wage negotiations on those showroom servers' behalf. The dis-

---

1. Prior to May, 1976, the first show involved the sale of food and drinks and was called a "dinner show"; the second show involved the sale of drinks only, and was called a "second show". Pursuant to a change in Hotel policy, both shows have, since May, 1976, been "second shows."

pute remained unsettled through the established grievance procedures and thereafter the Union requested that the matter be submitted to arbitration. Pursuant to Article 22 of the Collective Bargaining Agreement, Arbitrator John B. Lauritzen was chosen by lot to hear the dispute, and hearings were held on July 13 and 14 and October 4 and 5, 1978.

By Decision and award dated February 8, 1979 entitled "Re: Change in Ticket Policy for Main Showroom" (hereinafter referred to as "Award"), the Arbitrator found that the Hotel's institution of the Ticketron system converted every showroom admission into a "special event" within the meaning of § 18.01 of the Agreement, which states:

A special event shall be deemed to be any event for a person, persons, group or groups arranged by a travel agent, booking agent, hotel sales representative, convention agent, promotional representative, operator *or any other individual or agency* where *tickets*, coupons or package prices for food and/or *beverages* to be served to patrons of such events are *involved* and where regular employees of an establishment covered by this Agreement provide such service.

(emphasis added). That is, the Arbitrator concluded that because beverages were available in the showroom at an additional cost to the patron, and the Hotel required that the showroom servers attempt to sell those drinks to "Ticketron" customers, every ticketed seat in the showroom "involved" the price of beverages and thus became a "special event." (Award, pp. 48–50). Additionally, and as an alternate basis for his finding, the Arbitrator concluded that, based on the testimony of Jeff McColl, president of the Union at all relevant times, coupled with the fact that protection of tipping potential for all showroom servers was and has always been a key consideration in collective bargaining between the parties, that the phrase ". . . food and/or beverages to be served to patrons of such events are involved" was not intended by the parties to modify the phrase "coupons or package prices." (Award, pp. 51–56).

By means of remedy, the Arbitrator determined that the proper procedure to compensate showroom servers for lost earnings was for the Hotel to pay such servers 15% of the price of each ticket sold for admission into the showroom for each show since May 18, 1978. (Award, p. 57). He based this remedy on § 18.03(a) of the Agreement, which provides:

Cocktail servers serving guests included in a special event at the second show in the main showroom shall be guaranteed a *minimum* gratuity per person served of *fifteen percent (15%)* of the *then current minimum charge to general public* for the second show.

(emphasis added). That is, the Arbitrator determined that under the new Ticketron system, each price range involved constituted a "then current minimum charge", and he based his award accordingly. This resulted in the Hotel having to pay the showroom servers approximately $725/week/server between May 18, 1978 and March, 1979. The Hotel initially took the position that it would not pay the award, absent a clarification by the Arbitrator. In response, the Union threatened to use its right to strike to enforce collection of the award. Accordingly, the Hotel and the Union, by and through their counsel of record, entered into an agreement executed on March 7, 1979, whereby the Hotel agreed to make prompt payment of the Award, but that the Hotel's satisfaction of the Award would in no manner prejudice its right to seek judicial review of that Award. The Hotel did in fact pay out a total of $1,477,498 by April 28, 1979. The Hotel also petitioned Arbitrator Lauritzen for clarification and/or modification of his Award with respect to his calculations of the amounts owed under Section 18.03(a) of the Agreement, and he denied the Petition on April 10, 1979.

Since the time of the Award, the Hotel has dismantled its Ticketron system, and the same no longer remains in effect.

It appears that there are three issues for this Court to resolve: 1) Whether the controversy at bar is moot by reason of the

Hotel's compliance with the Award and dismantling of its Ticketron system; 2) Whether the Arbitrator's determination that a sale of a showroom ticket to a member of the general public constitutes a "special event" within the meaning of § 18.01 of the Collective Bargaining Agreement should be vacated; and 3) Whether the Arbitrator's determination of the appropriate Award pursuant to § 18.03 of the Collective Bargaining Agreement should be vacated.[2]

For reasons stated below, the Court concludes that the controversy at bar is not moot, and the Arbitrator's Award should be vacated in full.

## CONCLUSIONS OF LAW

*1. Mootness.*

The within action is not moot, for several reasons.

■■■ First, and foremost, is the fact that to hold this controversy moot would be to deny Plaintiff its right of judicial review. The case which demonstrates this most clearly is that of *Goodyear Tire & Rubber Co. v. Federal Trade Commission,* 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326 (1938). In that case, the F.T.C. charged Goodyear with violation of section 2 of the Clayton Act, by discriminating in the price of tires between those sold in interstate commerce to Sears, Roebuck & Co. and those sold to independent Goodyear dealers, and issued a cease and desist order against Goodyear. Goodyear petitioned for review of that order. Several months later, Congress enacted the Robinson-Patman Act, and when that law became effective, Goodyear immediately ceased to manufacture tires for Sears under the terms of its existing contract. The Sixth Circuit held that the petition for review was moot, inasmuch as discontinuance of the complained-of acts was due to the petitioner's own voluntary cessation of the same. 92 F.2d 677, 679–680 (6th Cir. 1937). The Supreme Court reversed, stating:

Discontinuance of the practice which the Commission found to constitute a violation of the Act did not render the controversy moot. [cites omitted] The Commission, reciting its findings and the conclusion that respondent had violated the act, required respondent to cease and desist from the particular discriminations which the order described. That is a continuing order. . . . As a continuing order, the Commission may take proceedings for its enforcement if it is disobeyed. But under the statute respondent was entitled to seek review of the order and to have it set aside if found to be invalid. . . . [T]he transactions subsequent to that order . . . [did not deprive] the respondent of its right to challenge the order and to have its validity determined . . .

304 U.S. at 620, 58 S.Ct. at 864–865. Similarly, 9 U.S.C. § 10 grants Plaintiff herein the right to petition this Court for review of the Arbitrator's award. The only difference between the *Goodyear* case and the case at bar is that, rather than "voluntarily" ceasing the complained of act prior to the hearing on petition for judicial review, the Hotel stipulated with the Union that it would do so, after being threatened with the prospect of a labor strike if it did not. That distinction is without a difference, for two reasons. First, a labor dispute is not made moot where a party abandons its complained-of activities as a result of harassment or threatened harassment by the other party; there can be no requirement that a party to a labor dispute subject itself to a strike or a lockout and/or physical violence throughout the pendency of the action in order to preserve it as a live controversy. *Allee v. Medrano,* 416 U.S. 802, 810, 94 S.Ct. 2191, 2197, 40 L.Ed.2d 566 (1974). Secondly, a stipulation between parties which reserves certain legal issues for a court of law to determine and does away with others, and does not concede any factual issues, does not create a "hypothetical situation"

---

**2.** A Fourth Issue—that Plaintiff's Motion for Summary Judgment does not conform to the technical requirements of F.R.C.P. Rule 56—

has been obviated by the Plaintiff's Response to Defendants' Cross-Motion for Summary Judgment.

such as to make a case or controversy moot. *Miller v. Amusement Enterprises, Inc.*, 394 F.2d 342, 347 (5th Cir. 1968). Such is the case at bar. The stipulation entered into between the parties at bar appears to concede the showroom servers' right to collect the Arbitrator's award, free from subsequent restitutionary proceedings, but does not otherwise concede disputed questions of fact and of law before the Arbitrator or the Hotel's right to seek judicial review of the Award.[3]

■■■ A second reason that this action is not moot is an exception to the mootness doctrine, familiar to labor disputes, that the complained of acts, since deceased, are "capable of repetition, yet evading review." See: *Allee v. Medrano, supra*, 416 U.S. at 809–811, 94 S.Ct. at 2197–2198; *N. L. R. B. v. Raytheon Co.*, 398 U.S. 25, 28, 90 S.Ct. 1547, 1549, 26 L.Ed.2d 21, 24 (1970); *Cedar Coal Co. v. United Mine Workers of America*, 560 F.2d 1153, 1162–1165 (4th Cir. 1977). This doctrine has as its source policy, rather than purely constitutional considerations, (*Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 756, n. 8, 96 S.Ct. 1251, 1260, n. 8, 47 L.Ed.2d 444 (1976)), and it applies if the Court can make two findings: first, that there is a reasonable expectation that the same complaining party will be subjected to the same action again; and second, the challenged action has been in its duration too short to be fully litigated prior to its cessation or expiration. *Division 580, Amalgamated Transit Union, etc. v. Central New York Regional Transp. Authority*, 578 F.2d 29, 32 (2nd Cir. 1978), and cases cited therein. As to the first element of that test, the burden rests on the party claiming mootness to prove that the specific acts complained of have not been repeated and that, with a reasonable degree of assurance, that they will not be repeated in the future. Cf. *N. L. R. B. v. Raytheon Co., supra*.

In the case at bar, the "capable of repetition yet evading review" doctrine applies. Until the Arbitrator's decision is reviewed,

the challenged action has been in its duration too short to be fully litigated, notwithstanding the intervening termination of the complained-of acts. The Ninth Circuit appeared to state this impliedly in *Local Union 77 International Brotherhood of Electrical Workers, AFL–CIO v. Puget Sound Power & Light*, 506 F.2d 523 (9th Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1429, 43 L.Ed.2d 674 (1975) when it stated:

> . . . [T]he strong policy favoring arbitration would be frustrated if [a party to a labor dispute] were permitted to moot a continuing general issue by taking amelioratory action in individual cases after they have come before the court.

506 F.2d at 524. And, there is no guarantee, based upon the record before the Court, that Caesars Palace will never reinstate the Ticketron system. It is crystal clear to this Court that the reason the Hotel dismantled the Ticketron system was that, pursuant to the Arbitrator's Award, it had to pay its showroom servers seven to ten times the amount of gratuities that they would otherwise receive as long as that system were to remain in effect. It follows therefrom that if the Arbitrator's Award were to be vacated, the Hotel very possibly could reinstitute the Ticketron system once this dispute is finally determined or settled.

### 2. Review of "Special Event" Determination.

There is no dispute at bar concerning whether the within grievances were arbitrable; that is, everyone, including the Court, agrees that the issues submitted to the Arbitrator were within his power to decide under the terms of the Collective Bargaining Agreement. Accordingly, the issue before the Court is whether the Arbitrator exceeded his authority.

■■■ The standard of review of an arbitrator's award made within his jurisdiction is set forth in *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) as follows:

---

**3.** The Court finds reinforcement of this interpretation of the Stipulation from the face of the Complaint herein, which seeks "only" judicial review of the Arbitrator's Award, and does not seek restitution of the moneys paid out pursuant to that Award.

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of the problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

363 U.S. at 597, 80 S.Ct. at 1361. That is, if an arbitrator's award deviates from the plain meaning of a labor contract provision, or if the record reveals no support whatever for his determination, the District Court is empowered to set aside the arbitrator's award. *Storer Broadcasting Company v. American Federation of Tel., etc.*, 600 F.2d 45, 47 (6th Cir. 1979), and cases cited therein. Otherwise, the award must stand.

■ Did this Arbitrator's Award draw its essence from the Collective Bargaining Agreement before the Court? Did his determination that the sale of tickets to members of the general public under the Ticketron system constitutes a "special event" fall within either the plain meaning of § 18.01 of the contract or within the contemplation of the parties at the time of negotiations? I must answer these questions in the negative.

Looking to the language of Section 18.01 again, it is clear to this Court that the term "special event" means an event which is arranged by someone other than the Hotel's showroom reservation clerk and which would include complementary tickets, com-plementary coupons or package prices for "special guests" of the hotel—that is, persons who would be likely to spend a great deal of money at Caesar's Palace because they are either high-stakes gamblers, for example, or are visiting Las Vegas in connection with a junket. Applying common sense, it is hard for this Court to imagine how an event could be "special" to somebody who, with the lack of insistence or incentive by the Hotel, could pay to see a show fourteen (14) times a week, fifty-two (52) weeks a year.

The Union argues, however, that the language of Section 18.01 is so broad that, taken to its broadest meaning, the Ticketron system falls within its meaning. That is, the Arbitrator could have interpreted the words "or any other individual or agency" to include a Hotel showroom reservations clerk, and he could have interpreted the words "tickets . . . for beverages to be served to patrons of such events are involved" to include ticket sales to the general public. The question therefore arises: Is there anything in the record before the Arbitrator that even arguably supports that conclusion? The answer is no.

The Arbitrator found, based upon the evidence before him, that the parties did not negotiate the issue of whether a ticket sale to a member of the general public constituted a "special event" prior to the institution of the Ticketron system because there was no need to; under the pre-Ticketron and post-Award system, the Showroom Servers were not concerned with whether such customers would be deemed to be part of a "special event" so long as they had the right to present a check to such customers for the entire cost of the show plus extra drinks, and said customers could compute and leave a voluntary gratuity on that basis. (Award p. 10). The Arbitrator also found, based upon the evidence before him, that the Hotel's Ticketron system was never in the contemplation of either of the parties at the time of any relevant contract negotiations. (Award, p. 23).

■ How, then, could the Arbitrator conclude that sales of tickets to members of

the general public under the Ticketron system constitutes a "special event"? Of the 597 pages of Reporter's Transcript before the Court, covering four days of testimony, the Arbitrator based his award on one statement of the President of the Union, Jeff McColl.[4] It is important to view that statement in the context of his testimony:

Q: What was stated as the Union's position [in agreeing during the 1970 contract negotiations to management's proposal of placing the words "for food and/or beverages to be served to patrons for such events" after the words "tickets, coupons or package prices"]?

A: That both the employers and the Union were having difficulty in relating the special events coverage to junket guests who were not identifiable by a ticket or coupon, and that the junkets come in so many forms that we were not able to distinguish those that included entertainment or food and beverage and those that did not, and whether the entertainment was built in and a part of the junket. There are junkets that come to Las Vegas that are completely free to the junketeer. There are those that come that are partially free. There are those that come on purely a reduced room rate that include nothing else. They come in every shape and form.

And we, again, both sides were having a terrible time trying to figure out who was covered and who was not. And that was the basis as I remember it, for the proposal and our agreement.

Q: And as a result of this, the junketeers then were not included under the package price definition unless food and beverage was part of the package price for junketeers?

A: That is correct.

Q: And explain to the Arbitrator again what a junketeer is.

A: A junketeer is a preferred type of customer that the hotel anticipates will be a bigger gambler than the average person who walks in on vacation. And the hotels generally are heavily engaged in promoting junkets to bring so-called high rollers, or at least better than average gamblers into their hotels.

Again, if they have a proven group that they know are all relatively good gamblers, they will come as what is known as RFB, Room, Food and Beverage. It is all comped. There are some marginal groups that may come on just a reduced room rate and a guarantee of a show.

Q: Those junketeers would not have any tickets or coupons or a sign identifying them, is that correct?

. . . . .

A: That is correct.

Q: And so the only way you could tell to what extent the hotel was paying their way would be to later check on what type of package it was?

A: Yes.

Q: And as a result of this addition, the distinction was made as a package price for junketeers, that if they got free room and board as part of it, the tip would then be applied?

A: Yes.

Q: Was there any discussion of the addition of the food and beverage as far as the ticket or coupon was concerned?

A: No. <u>The ticket or coupon we had never had any problem with that.</u> That person—

(Transcript, October 4, 1978, pp. 253, l. 6—255, l. 18). From the one underlined sentence above, the Arbitrator concluded that the words "for food and/or beverages to be served to patrons for such events" was not

**4.** The Hotel argues that the Arbitrator improperly ignored testimony on this point by William Campbell, the Executive Director of the Nevada Resort Association, on the basis that it was elicited by leading questions. Resolution of this point is irrelevant to disposition of the within cause, but the Court would note the generally held rule that an arbitrator cannot exclude relevant evidence on a material issue on the basis of purely technical procedural rules of which the parties to the bargaining agreement may not have been apprised. *Local Union No. 251 v. Narragansett Imp. Co.*, 503 F.2d 309, 312 (1st Cir. 1974), and cases cited therein.

necessarily intended to modify the words "ticket or coupon", and thus, a ticket sale to a member of the general public could constitute a special event within the meaning of § 18.01 of the contract. (Award, pp. 17–20). Since McColl nowhere testified about the contract language with respect to sales of show tickets to the general public, it is difficult for this Court to understand how that result logically follows. Within the context of his testimony, the Court would interpret the statement "The ticket or coupon we had never had any problem with that" to mean that, unlike the situation with junketeers and package prices, the parties had never had any problems *in computing the gratuity due and owing* the server with respect to customers bearing "tickets" or "coupons." This, however, is not probative of whether a sale of a ticket to a member of the general public through the Hotel's showroom reservation clerk constitutes a "ticket" or "coupon" within the meaning of the contract.[5]

The Arbitrator also found that, under the Ticketron system, a sale of a show ticket "involved" the price of a beverage because, notwithstanding the fact that drinks were not made a part of the show ticket price and the purchase of the same were made entirely optional, the showroom servers had the duty to attempt to sell drinks to Ticketron customers. (Award, pp. 48–50).

This determination, however, is not logically consistent within the meaning of the contract for two reasons: first, the word "involve" can be synonymous with the word "include" (cf. *Webster's Third New International Dictionary*, Unabridged, "involve", p. 1191, ¶ 5a), and the Ticketron ticket price did not "include" the price of food or beverage. Second, a show ticket sold to the general public prior to the Ticketron system similarly "involved" the price of beverage in that a customer could purchase drinks

from a showroom server beyond those included in the price of a ticket; yet, it is undisputed that § 18.01 was not aimed at show ticket sales to the general public at the time the contract was entered into.

 The Court can understand why the Arbitrator acted as he did. Whether intentionally or not, ᷉the Hotel drastically reduced the gratuity income of its showroom server employees by the institution of its Ticketron system. Nonetheless, an arbitrator cannot write or rewrite a contract for the parties. If the evidence establishes that the collective bargaining agreement does not embody an understanding between the parties on a certain point, the arbitrator should so find and rule accordingly. Cf. *Kansas City Royals Baseball Corp. v. Major League Baseball Players*, 532 F.2d 615, 630–631 (8th Cir. 1976).

 Of course, an arbitrator may consider any relevant, new circumstances in achieving a just and equitable settlement of the grievance at hand. Cf. *United Steelworkers of America v. Reliance Universal Inc. of Ohio*, 335 F.2d 891, 895 (3rd Cir. 1964). However, this Arbitrator had at his means a method by which to arrive at a relatively fair and just solution without straining the language of the Collective Bargaining Agreement out of all natural proportions, as he did. In its second, alternate grievance, the Union contended that the Ticketron system so altered and increased the showroom servers' duties that the Union was entitled to immediately bargain concerning increased wage negotiations on those employees' behalf. In fact, the Arbitrator did find that the Ticketron system did cause an increase in the showroom servers' duties (Award pp. 28–30). It may well be that the showroom servers are thereby entitled to an increase in wages,

---

**5.** It is not precisely clear from McColl's testimony as to what the parties meant by "ticket" or "coupon", since he was not allowed to explain those meanings. However, it is clear from the context of the aforequoted testimony that it does not mean a sale of tickets to the general public. The only plausible interpretation that this Court can give within the context

of the contract language and McColl's testimony is that "ticket" or "coupon" means *complementary* "tickets" or "coupons", whereby the complemented customer is not inclined to leave the kind of gratuity that a paying member of the general public would, based upon a percentage of the cost to the customer.

which would offset their loss in gratuity income. In any event, the Arbitrator should have explored this grievance more fully.

### 3. The remedy.

■ Even if the Court were to have found that the Arbitrator had acted within his power in determining that sales of show tickets to the general public through the Ticketron system constituted a "special event," the Court would nonetheless conclude that the award itself in terms of the remedy prescribed would have to be vacated.

■ There are two reasons for this. First, the plain meaning of the word "minimum" is "the least quantity assignable, admissible, or possible in a given case" (Webster's Third New International Dictionary, Unabridged, "minimum," p. 1438, ¶ 2); that is, the word implies "the lesser of the two," "the least of the three," and so on. However, the Arbitrator interpreted the words, "then current minimum charge" in § 18.03 of the Agreement to mean that every different ticket price constitutes a minimum charge. The remedy fashioned by an arbitrator must be rationally explainable as a logical means of furthering the aims of the contract. *Diamond v. Terminal Ry. Alabama State Docks*, 421 F.2d 228, 234 (5th Cir. 1970). This remedy is illogical, and clearly is outside the essence and plain meaning of the agreement. "Every charge is a minimum charge" may be an acceptable analysis to James Thurber, but it is not to this Court.

■ Second, where a claim does not contain any demand for punitive damages, an arbitrator has no authority to award them. *Hotel and Restaurant Emp. and Bartenders Intern. Union, AFL–CIO v. Michelson's Food Services, Inc.*, 545 F.2d 1248, 1254 (9th Cir. 1976). "Punitive damages" means those damages which go beyond that which is reasonably compensatory under the circumstances. Cf. *Baltimore Regional Joint Bd. v. Webster Clothes, Inc.*, 596 F.2d 95, 98 (4th Cir. 1979). In the context of a claim for back pay or the equivalent thereof, an award would be deemed "punitive" where it would exceed the employee's usual or reasonably expected earnings. Cf. *International Broth. of Elec. Workers, etc. v. Olin Corp.*, 471 F.2d 468, 471 (6th Cir. 1972). In the case at bar, the showroom servers received seven to ten times the amount of gratuity income that they were accustomed to receiving as a result of the Arbitrator's Award. Since the Union's grievance included a claim for back income in the nature of wages, and since the Union did not request an award of punitive damages, the Arbitrator exceeded his authority in fashioning this award.

The one remaining question before the Court is whether, in vacating the Award, the Court should direct a rehearing by the Arbitrator. 9 U.S.C. § 10(e) provides:

> Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

Since the Agreement at bar (Article 22) is silent as to when arbitration awards must be made, the Court could order a rehearing on the "§ 1.01" grievance of the Union. The Court is of the belief that this may not be the most expeditious manner in which to handle the matter, for this reason: the Arbitrator already found that the Ticketron system altered and increased the showroom servers' duties; the only issue remaining, therefore, is what the corresponding increase in wages should be. However, the contract which the Arbitrator interpreted is set to expire on April 1, 1980—i. e., in less than thirty days. It would seem to this Court that this issue would be handled more expeditiously in the course of contract negotiations with respect to the new Collective Bargaining Agreement between the parties than in the course of further arbitration. And, the effect of this Court's Decision is to leave the question of whether the Ticketron system will be reimplemented by Caesars Palace or implemented by other members of the Nevada Resort Association open to negotiation. The parties to the negotiations may decide that the Ticketron

system will not be implemented and, if they do, the "increased wage" issue would be obviated. In any event, these are issues for the parties to decide, outside of the jurisdiction of the Courts and of Arbitrators, in the Court's opinion.

However, if the parties or either of them wish to have the Court's Decision and concurrent Order amended to provide for a rehearing by the Arbitrator [6] they or either of them may move the Court for an Amendment in that regard, provided that such a motion or stipulation is made within ten (10) days of this Decision.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law and the Court shall enter an Order concurrently herewith. Plaintiff shall prepare Judgment for the Court's signature, consistent with this Decision and concurrent Order.

---

**6.** In the event of a rehearing, the parties would be free to proceed with a different arbitrator, or with the same one, as is within their choice and Article 22 of the Agreement. Cf. *Electronics Corp. of America v. International Union of Elec., Radio and Mach. Workers, etc.*, 492 F.2d 1255, 1257 (1st Cir. 1974).